ESTATE OF SALLIE E. WALTON, DECEASED, THE PENNSYLVANIA COMPANY FOR INSURANCES ON LIVES AND GRANTING ANNUITIES, EMMA WALTON HALLOWELL AND ALBERT J. BUSSENIUS, EXECUTORS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 94787. Promulgated June 28, 1940.

*Harold D. Saylor*, Esq., for the petitioners.
*Eugene G. Smith*, Esq., for the respondent:

### OPINION.

DISNEY: This is a proceeding for the redetermination of a deficiency in Federal estate tax in the sum of $9,332.60 on the estate of Sallie E. Walton, deceased.

The sole issue is whether certain securities of the approximate value of $50,000, given by the decedent to her daughter about seven months before decedent's death, were transferred in contemplation of death within the meaning of section 302 (c) of the Revenue Act of 1926, as amended by section 803 (a) of the Revenue Act of 1932.

From the record herein we find the facts as hereinafter set forth.

Sallie E. Walton, the decedent herein, was 74 years of age at the time of her death, in December 1935. She was a large woman and the cause of death was cerebral thrombosis, or apoplexy. She had been a widow since May 1919. At the date of decedent's death she owned property of the value of approximately $250,000, not including the securities which were the subject of the gift here in question. Her only child, a daughter, Emma Walton Hallowell, one of the executors herein, was also a widow, having two children, daughters, born May 1, 1918, and May 3, 1920, respectively.

Emma Walton Hallowell's husband died in 1925 and in the same year Sallie E. Walton took up residence at her daughter's home in Merion, Pennsylvania, and continued to live there until about June 1935. During the period of about ten years residence at her daughter's, decedent contributed about $200 monthly towards the support of the daughter and grandchildren. She also paid tuition for one of the grandchildren at school, though for what period and in what amount the record does not disclose.

In December 1934, a year before her death, Mrs. Walton had a slight stroke, caused by cerebral thrombosis, which stroke confined

her to her bed for about a week and left her with a slight thickness in her speech and a somewhat impaired left arm. She soon got about again as before, being up most of the time, but confined to bed for brief periods, such as a day or two at a time, to rest. At the time of her stroke and thereafter, she had at least one nurse at all times. Her daughter felt that she needed some one to look after her, but she did not want the responsibility of being with her mother all of the time.

In 1935 her grandchildren were entertaining to some extent, coming in and going out of their home, which disturbed her and made her unhappy. She had been irritable and said to her daughter: "I am going down to the shore for the summer. I am just going to do what you want me to do. I am going to the shore. I know that this money [referring to the money or securities she gave her daughter] would help you and I will not have to bother with this monthly check"—which she had been giving her daughter. Mrs. Walton went to Atlantic City about the first of June 1935 to spend the summer and did not thereafter return to her daughter's residence to live. Before going, and in May 1935, she gave her daughter securities of a value of somewhat less than $50,000. The gift supplemented the daughter's own income, which was from $16,000 to $18,000 a year. The daughter, asked what the mother said at the time as to the reason for the gift, answered: "She did not want to be bothered with a check every month. She was getting older and she wanted to get relieved from a certain amount of responsibility." After the gift the mother ceased to make monthly contributions to her daughter. About September 1, 1935, Mrs. Walton went from Atlantic City to the Belgravia Hotel in Philadelphia, Pennsylvania, where she continued to reside until her death.

Decedent died on December 23, 1935, of cerebral thrombosis, caused by arteriosclerosis. She had been out Thursday or Friday before her death the following Monday and contemplated spending Christmas Day at Merion with her daughter. She had complained of indigestion two days earlier, had been in bed the previous day, and was sitting up when she fell over on the floor and died very suddenly.

Dr. Russell S. Boles had treated the decedent for about seven years, beginning in 1928. In 1931 he prescribed for her because of high blood pressure. In her last years he treated her for infirmities of old age and toward the end for blood pressure, general failing, circulation, etc. Her blood pressure at times would get to 220 or 230. The physician would refer casually to her high blood pressure, but never permitted her to feel alarmed about it. He cautioned her about overeating and gave her instructions about rest, quiet, and the amount of meat she should eat. He called upon her about once a week after the stroke in December 1934 and after her return to

Philadelphia from Atlantic City, where he had seen her about once a month and had kept in touch with her through correspondence, nurses, and personal visits. There was no radical change in her condition or conduct after May or June 1935 until her death. Almost up to the last day Mrs. Walton was permitted to do almost everything that she wanted to do, but not everything, because she was active and wanted to do things at times that in the opinion of her physician she should not do. Decedent did not suffer from headaches nor from indigestion, except that about two days before she died she thought something she had eaten gave her indigestion. The doctor originated visits to her. She was not given to calling upon him or any other doctor. He had had many patients who lived more than a year after slight strokes and some who lived ten years or more. It was his opinion that a person who has had one such stroke is more likely to have another than a person who has never had one.

Albert Bussenius always made out decedent's taxes and matters of that nature. He was executor of the estate of her husband. Decedent took care of the remainder of her own business. The amount or extent of such business and the form of her property are not shown. She went to moving pictures, called on people, and had callers, friends, to see her, and went out for motor rides, using her daughter's car and chauffeur. At Atlantic City she had her lunch and dinner in the dining room and her breakfast in her room. During her stay at the Belgravia Hotel her daughter, who lived some miles away, called on her daily and the mother visited the daughter about once a week and was during the year 1935 as active as most people in their seventies. Mrs. Walton never talked about death to her daughter, doctor, or a nurse who testified, and the doctor and daughter considered her of an optimistic nature. The decedent was a phlegmatic, unemotional type of person, not given to hysteria or instability.

Agnes Rafferty, one of the two nurses who attended the decedent while she was living at the Marlborough-Blenheim Hotel in Atlantic City and thereafter until her death, was called in by decedent's daughter, but took her instructions from Dr. Boles. He wanted some one to be with Mrs. Walton because of her age and the fact that at times she was unwell. She had a suite of rooms with the decedent. Prior to that time, the decedent had a surgical nurse. After Agnes Rafferty went to Atlantic City, another nurse came and the decedent was attended by two nurses, each with a twelve-hour duty. The doctor and decedent's daughter wanted some one to be with her. The nurses gave her her bath and helped her dress. Decedent could not walk so well as the nurse, but she could "get around." She sometimes walked with a cane. She took no long walks. Decedent read ex-

tensively and did some fancy work. Before leaving Atlantic City, Mrs. Walton spoke about returning the following summer and stated that she intended to stay in the Blenheim part of the hotel rather than in the Marlborough part because more of her friends were in the Blenheim part.

The principles governing the determination whether a gift *inter vivos* is made "in contemplation of death" are discussed in *United States* v. *Wells*, 283 U. S. 102. In cases like the instant one, the petitioner or taxpayer must overcome not only the presumption of the correctness of the Commissioner's determination, but also must overcome the statutory presumption of section 803 (a) of the Revenue Act of 1932, which provides:

* * * Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this title.

With respect to the above provision of the statute, the court in *Farmers' Loan & Trust Co.* v. *Bowers*, 98 Fed. (2d) 794, 799, said:

* * * This provision was intended to and does place upon the taxpayer the burden of proving by a fair preponderance of evidence that the transfer within two years of death is not made in contemplation of death.

The statutory presumption is rebuttable, as is the determination of the Commissioner that a gift has been made in contemplation of death. *United States* v. *Wells, supra; Frederick P. Ader et al., Executors*, 40 B. T. A. 582, 586. "The words 'in contemplation of death' mean that the thought of death is the impelling cause of the transfer, and while the belief in the imminence of death may afford convincing evidence, the statute is not to be limited, and its purpose thwarted, by a rule of construction which in place of contemplation of death makes the final criterion to be an apprehension that death is 'near at hand.'" *United States* v. *Wells, supra.* That case says:

* * * The best evidence of the state of the decedent's health at the time the transfers were made is the statement of his doctor. The best evidence of the decedent's state of mind at that time and the reasons actuating him in making the transfers are the statements and expressions of the decedent himself, supported as such statements are by all the circumstances concerning the transfers.

Here the petitioner has adduced evidence of the doctor as to condition, showing that it was critical, necessitating constant care, with a nurse 24 hours a day, and resulting in death after a few months, but has adduced almost a minimum of evidence as to statements or expressions of the decedent as indicative of reasons actuating the transfer. We have above quoted verbatim the only expression from

the decedent bearing upon the transfers. The fact that decedent did not express to the doctor, the daughter, and a nurse what she may have thought as to death is patently of little or no import, particularly since she is shown to have been a phlegmatic, unemotional nature, not given to hysteria. An ordinary person of that description probably would not have disclosed her state of mind. Even if we assume as a fact that she was an optimistic person, as her daughter and doctor considered her, such fact would not be of any great effect. In *Clarence A. Neal et al., Executors*, 16 B. T. A. 1058, 1065, we said:

    * * * The petitioners urge that mental alertness, continued interest in business activities and plans for future pleasure and general optimism are opposed to the proposition that the decedent in any way anticipated, contemplated or suspected that death was to be expected in the close or "reasonably distant" future and these facts are, of course, of importance, but we do not regard them as conclusive of the issue before us, since man sometimes exudes optimism and courage when pessimism and fear exist within. In many cases this may be an unnatural condition, but it is, nevertheless, true that outward appearances are no infallible index to man's inner consciousness. As was said by the court in *Rosenthal v. People*, 211 Ill. 306; 71 N. E. 1121:

        His physician did not tell him he was going to die. He did not ask the physician what was the matter with him, and the physician did not tell him. He talked about going abroad to recuperate, and said nothing about his death. There was no talk by him or his wife, or any one, on that question.

    *      *      *      *      *      *      *      *

    * * * While the widow and physician testified that the deceased did not expect to die, they also said that it was not the subject of conversation at all, and in view of his condition it is a fair inference that he was not so dull of comprehension as to suppose that he would get well.

In the *Neal* case, as herein, the decedent had some plans for the future, but they were not considered by us as negativing contemplation of death. Of course it is not material that decedent, two or three days before Christmas, expected to spend it with her daughter, for under the *Wells* case, *supra*, contemplation of death is not confined to the thought of immediate decease.

The only expression from the decedent, as above seen, is, in substance, that she knew the money would help the daughter and that she, the decedent, would not have to bother with a monthly check; to which may possibly be added what may be, not decedent's expression, but the opinion of the daughter, that she was getting older and wanted to get rid of a certain amount of responsibility. Does this evidence meet petitioners' burden of proving that the transfer was not in contemplation of death?

There is a line of cases which indicates that if a gift is made in consonance with a general practice to make gifts of that kind and

commensurate in amount therewith, the gift will not be considered made in contemplation of death. Obviously, the logic is that, since throughout life there has been a custom of making such gifts, the particular gift in question is thereby indicated to be merely a customary act, and not one in contemplation of death. However, the logic seems inverted where as here the customary gift has been about $200 a month and the gift in question is $50,000, equal to $200 per month for about 20 years. In such case the gift by its very size is indicative, not of a mere conformity to custom or habit, but affirmatively of a breaking of that custom, and an indication that some unusual reason prompted it. The present case, therefore, resembles that of *Frederick P. Ader et al., Executors, supra*, where we said:

* * * Decedent, for reasons unknown, in August 1935 departed from her express policy to not make any gifts while her assets were worth not in excess of $100,000, i. e., in August 1935 her assets were not worth a "substantial amount over $100,000." She decided, for reasons not known, to make gifts to her sons, regardless of lack of increase in values of her assets. * * *

We concluded that a showing of freedom from contemplation of death had not been made. As in the instant case, the decedent was aged, suffered a complication of a disease seldom curable, and made gifts shortly thereafter, representing about one-fourth of her holdings.

There are cases which uphold gifts as not in contemplation of death if made to escape business cares, worries, or management. The evidence here wholly fails to justify such a conclusion. The decedent, by making the gift of $50,000, merely escaped the burden of writing a check for about $200 once a month. Such a case can not with logic be placed in the same category with those where weighty business cares and management were escaped by gifts made. Moreover, the frailty of this idea is emphasized by the fact that the daughter to whom the checks had been made and the gift was made lived in the same house with her until after the time of the gift, saw her mother daily while she was in Philadelphia after returning from a summer in Atlantic City, and saw her there apparently frequently, since the daughter testified about her mother's habits there. It is obvious, therefore, that no more than a trivial burden was escaped by making the gift, instead of an occasional check. Yet that, in effect, is the only reason ever announced by the decedent for making the gift. We consider it insufficient to sustain the burden of showing that the Commissioner's determination was error.

The gift, as above seen, was equivalent, roughly, to monthly checks of $200 for about twenty years, and the reasonable indication is that of apprehension that the donor would not be available to give such checks, i. e., a contemplation of death, rather than indication of disproof thereof.

About five months before the gift the decedent had had a stroke, affecting speech and one arm. It was likely to recur. It did recur about seven months later and was fatal. She was 74 years of age, with a nurse with her 24 hours a day. It is obvious that the doctor, who felt it was his duty to keep the decedent under observation, and decedent's daughter, who wished some one to be with her mother, feared the sudden death which did overtake the decedent. The decedent was slowly failing. She was phlegmatic by nature, and her failure to discuss death means little, if anything. Her mode of life, as shown, is consistent rather than inconsistent with expectation of death. It is not comparable with active business life, found in many cases where contemplation of death was negatived, nor with the activities which in the *Neal* case, *supra*, we considered insufficient to meet the burden of proof. We think she did not act without consideration of her condition and the attention she was receiving.

In the light of the entire record, we are of the opinion and hold that the statutory presumption of contemplation of death and the presumption of the correctness of the Commissioner's determination have not fairly been overcome by the facts and circumstances shown in the record, and that under such presumption the transfer of the securities made by decedent to her daughter was made "in contemplation of death" within the meaning of the revenue statute. The action of the respondent is, therefore, approved. *Armin L. Kelly, Administrator*, 8 B. T. A. 1193.

Reviewed by the Board.

*Decision will be entered for the respondent.*

ARUNDELL and LEECH dissent.