Estate of Benjamin Paschal O'Neal, Benjamin Paschal O'Neal, Jr., and the Citizens & Southern National Bank, Executors v. Commissioner.
Estate of Benjamin Paschal O'Neal v. Commissioner
Docket No. 4012.
United States Tax Court
1947 Tax Ct. Memo LEXIS 174; 6 T.C.M. (CCH) 713; T.C.M. (RIA) 47167; June 24, 1947
C. Baxter Jones, Esq., Marion Smith, Esq., and Charles M. Cork, Esq., 1007 Persons Bldg., Macon, Ga., for the petitioners. F. L. Van Haaften, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined a deficiency in estate tax in the amount of $253,099.95. The deficiency results from several adjustments of the respondent of which only one now remains *175 in issue. The petitioners, in the petitioner, made several allegations of error which are no longer in issue. The petitioners made claim for increase in the amount of the deduction for miscellaneous administration expenses. It has been stipulated that adjustment will be made by agreement of the parties under Rule 50, by which petitioners will receive an increase in the amount of the deduction for administration expenses of the estate. Petitioners now concede that the proceeds of certain life insurance policies are includible in the gross estate of the decedent. The parties have stipulated the values of certain stocks which are to be given effect in a recomputation under Rule 50. The remaining issue is whether the decedent created four trusts and made transfers of property to them in contemplation of death and in lieu of disposition by his last will, under the provisions of section 811(c) of the Internal Revenue Code. The estate tax return was filed with the collector for the district of Georgia. Findings of Fact The parties have filed a stipulation of facts which is incorporated herein by this reference and adopted as findings of fact. The decedent *176 died testate on December 24, 1940, a resident of Macon, Georgia, at the age of 82. Decedent was born October 9, 1858. The decedent was married in 1888. During the period from 1888 until 1906, he was engaged in the lumber business in Crisp County, Georgia. In 1906 he liquidated his business interests in the southern part of Georgia and moved with his family to Macon, Georgia, where he resided until his death. From 1906 until 1914, the decedent had active and substantial business interests in Macon, but after that time and for the last 25 years of his life his business activities consisted of managing his own investments and securities, serving on boards of corporations in which he was interested, and other incidental and occasional business activities. The decedent executed four trust agreements on December 19, 1934. At that time he was 76 years old. At the time decedent created the trusts, in 1934, his immediate family consisted of his wife, Anna J. O'Neal, a son, Benjamin Paschal O'Neal, Jr., and two daughters, Glayds O'Neal Adams Barden, and Erin O'Neal Clarke. The ages of the members of the decedent's family on December 19, 1934, were as follows: His wife was 72 years old, *177 his son was 34 years old, his daughter Erin was 45, and his daughter Gladys was 41. The decedent had three grandchildren, daughters of his daughters, as follows: Erin O'Neal Clarke, age 17; Mary Adams Barden Northcutt, age 21; and Erin Adams Barden Brooks, age 19. Decedent's wife was named the beneficiary of one of the trusts and each of decedent's three children was named the beneficiary of one of the other three trusts. The Citizens & Southern National Bank and Benjamin P. O'Neal, Jr., son of decedent, were named trustees of each trust. The corpus of each trust consisted of stocks and bonds. Decedent also transferred to the two trusts for the daughters cash in the amount of $20,000 each, but no cash was transferred to the trusts for decedent's wife and son. The value of the property transferred by decedent to each trust was reported in the gift tax return as follows: Anna J. O'Neal Trust
$124,194.33
Benjamin P. O'Neal, Jr., Trust
124,184.30
Erin O'Neal Clarke Trust
175,228.56
Gladys O'Neal Adams Trust
175,228.66
The provisions of the four trust agreements are substantially the same. The four trust instruments are incorporated herein by reference. The *178 provisions of the trust for one of the daughters, Erin O'Neal Clarke, are set forth hereinafter as illustrative of the other trust instruments. The trust agreement provided that income was to be paid in the amount of $500 per month to the daughter for life. The balance of the income in excess of $500 per month was to be paid to the daughter at the end of each year. Upon the death of the daughter and until the trust terminated, income payments were to be divided equally between the descendants of the daughter or, in the event the daughter died without descendants, between the descendants of the grantor. The trust instrument further provided that the trust was to terminate upon the death of all of the children of the grantor, or when the youngest of his grandchildren should reach the age of 21 years, whichever event should occur later. Upon the termination of the trust, the corpus and undistributed income were to be paid over to the living grandchildren and descendants of deceased grandchildren of the grantor. Paragraphs 2, 5, and 8 of the trust deed provided as follows: "II. INVESTMENTS. During the lifetime of the Grantor the corpus and undistributed income of said trust shall *179 be invested and re-invested as he shall direct, and no sale of any of said property and no investment or re-investment of any sums now or hereafter in the hands of the Trustees shall be made, except upon his written instructions. Compliance with such written instructions shall relieve the Trustees of all liability for such sale or investment. * * *
"V. ADDITIONS TO CORPUS. The Grantor shall have the right to transfer to and deposit with, or cause to be transferred to and deposited with the Trustees any other or further property or securities, which shall thereupon become a part of the corpus and shall be held by the Trustees upon the same terms and conditions as the property or securities hereby transferred. * * *
"VIII. The Grantor shall have no power, either alone or in conjunction with any other person or persons, to change the beneficiaries or remaindermen, or revest in himself any part of the corpus or income, or to revoke, alter, modify or amend this instrument in any way except to make additions to the corpus and appoint successor trustees, as hereinbefore provided." Subject, during the lifetime of decedent, to the provisions quoted above, the trustees were given *180 specific powers of investment and management over the corpus of the trust. The trust agreement also contained provisions relating to the compensation of the trustees, vacancies in the office of trustees, and the method of appointing successor trustees. The provisions of the trust deeds for the other daughter and the son and wife of decedent were substantially the same as those set forth above, with the exception that the trusts for the wife and son provided that income in the amount of $350 per month was initially to be paid to the respective beneficiaries rather than the $500 made available for the daughters. On December 19, 1934, the same day decedent executed the four trust instruments, he executed a will providing in major part for the creation of a testamentary trust for the benefit of decedent's wife and three children. Decedent's son and the Citizens & Southern National Bank, trustees of the four inter vivos trusts created on the same day were also named as executors under the will and as trustees of the testamentary trust. Disposition of the income and corpus of the testamentary trust was very similar to that provided for in the four inter vivos trusts. The will stated *181 that the trustees of the testamentary trust were to pay $650 per month to the wife for life and the remainder of the net income was to be divided into four equal shares and paid quarterly to the decedent's wife and three children. The term of the testamentary trust was the same as the terms of the inter vivos trusts, i.e., until the death of the children or upon the youngest grandchild reaching the age of 21 years, whichever event should occur later, with the exception that one-third of the corpus of the testamentary trust was to be paid to the son free and clear of the trust if he survived Anna J. O'Neal, the wife of decedent. The trustees were given powers of investment and management over the corpus of the testamentary trust similar to the ones which were granted to them with respect to the inter vivos trusts. Vacancies in the office of trustee were defined and were to be filled in substantially the same way as vacancies in the office of trustee of the inter vivos trusts. On November 17, 1936, decedent executed his last will and testament, which was duly probated upon his death. The 1936 will was susbtantially identical with the will of December 19, 1934, with the exception *182 that the 1936 will provided for a $25,000 trust fund for charity which was not contained in the earlier will. The will which decedent executed on December 19, 1934, revoked a prior will which he had executed in July 1934, which in turn had supplanted a previously existing will. The July 1934 will provided also for a testamentary trust of the residue of decedent's estate. The trustees were the Citizens & Southern National Bank and son of decedent and were greatly restricted in their power to invest and manage the corpus of the trust. The will provided for payments of $1,000 monthly to decedent's wife for life, $666.67 to each of his daughters, and $500 to the son with the payments to the daughters and the son to be increased to $833.33 and $666.67, respectively, after the death of decedent's wife. Provisions relating to the term of the testamentary trust, disposition of the corpus at its termination, and vacancies in the office of trustee were contained in the July 1934 will which were similar to those contained in the inter vivos trusts and the December 19, 1934, and last will of decedent. For many years prior to the creation of the four inter vivos trusts on December 19, 1934, decedent *183 had contributed substantially to the support of his three children. Each of decedent's two daughters were married in 1912. Their respective husbands failed to provide sufficient income for the support of the families. Prior to 1930 decedent advanced to G. Clisby Clarke, the husband of decedent's elder daughter, Erin O'Neal Clarke, approximately $37,000 for various business ventures which proved unsuccessful. Clarke was later forced to reduce his business activities because of ill health. Decedent also advanced to Jennings T. Adams, the husband of his other daughter, Gladys O'Neal Adams, around $35,000 for business purposes. Adams was addicted to drinking and decedent's daughter left him in 1933 and finally obtained a divorce in 1934, at about which time Adams was permanently committed to an institution for the insane. Decedent made substantial payments to his son for investment by the son in business for stock and cotton market trading. Decedent's contributions for these business dealings of his son were approximately $200,000. The son was not successful in his business and investment ventures and lost substantially the entire amount contributed to him by decedent. The son was *184 married in 1927. At that time he had no remunerative occupation. In 1931, after his unsuccessful stock and cotton market investments, the son entered into an investment brokerage business in Macon. The son earned very little income from the business and prior to the creation of the trusts in 1934 he was dependent upon his father for the support of himself and his family. From 1928 for the daughters, and 1929 for the son until the creation of the four trusts on December 19, 1934, decedent made quarterly contributions in the amount of $1,000 each to his daughters and son for their support. Decedent's children were primarily dependent upon decedent for support. Decedent maintained records of the payments which he made to his children as follows: Year
Benjamin. Jr.
Erin
Gladys
1922
$39,255.26
$28,179.92
$ 640.06
1923
10,000.00
2,569.79
10,800.00
1924
700.00
2,105.00
870.00
1925
100.00
891.55
700.00
1926
17,000.00
2,219.59
1,529.40
1927
1,100.00
3,085.05
3,175.00
1928
100.00
5,200.19
6,914.57
1929
61,840.00
4,817.93
4,170.00
1930
49,688.79
4,779.58
8,769.58
1931
43,945.05
5,420.61
6,172.96
1932
31,522.39
7,985.05
6,945.22
1933
4,495.00
5,305.53
7,397.96
1934
4,000.00
7,196.70
7,529.13
1935
1,041.64
7,631.30
1,990.27
1936
1,036.30
1,178.63
1,012.92
1937
1,030.98
1,175.97
1,008.94
1938
1,025.84
1,173.40
1,003.93
1939
1,020.68
1,170.82
1,002.03
1940
1,015.52
1,168.24
995.45
*185 The quarterly payments of $1,000 which decedent made to each of his children after 1928 and 1929 for support are reflected in the table set forth above. The amounts credited to the children in 1935 and the following years in almost all instances represent premiums on policies of insurance on decedent's life of which each child was the beneficiary, with the exception of additional payments of $1,000 in 1935 to Gladys and $6,000 to Erin intended to equalize the gifts among the children. Decedent's declared purpose in setting up the trusts for his children was to provide an income comparable with and to replace his prior annual gifts for their support. Decedent expressed this purpose to each of his children, to the trust officer of the Citizens & Southern National Bank, and to the attorney who prepared and drew up the trust instruments. Decedent informed his children that they would have to live within the income of the trusts which he had created for them. After the creation of the trusts, decedent discontinued paying regular allowances to his children and made relatively few other gifts to them. Decedent's purpose in setting up the trusts to insure his children of sufficient income *186 so that he could discontinue his allowances and payments to them was used as a guide in determining the amount of securities which decedent transferred as the corpus of each trust. The income of the trusts for decedent's children and the average contributions by decedent to each of the children during the years 1932, 1933, and 1934, excluding the extraordinary advances to the son in connection with commodity investments in 1932, were as follows: Amount of
Average con-
fixed pay-
tributions by
ments to be
decedent dur-
made quar-
ing 3 years
terly solely
Gross income
immediately
out of income
from trusts
Beneficiary
prior to 1935
from trusts
in 1935
Erin O'Neal Clarke
$6,829.09
$6,000.00
$8,721.20
Gladys O'Neal Adams
7,290.77
6,000.00
8,720.55
B. P. O'Neal, Jr.
4,339.13
4,200.00
5,496.00
Prior to the execution of the four trust instruments on December 19, 1934, decedent was informed by the attorney who prepared and drew up the trust instruments of the income, gift, and estate tax consequences of their creation. Decedent used his power to direct investments of the trusts several times in 1935, 1936, and 1937. At the *187 time of the creation of the trusts on December 19, 1934, decedent was in good health and had no apprehension of imminent death. Decedent was then 76 years old and had had no serious illness for many years prior thereto. In 1919 decedent suffered a cerebral hemorrhage from which he apparently recovered completely after the removal of part of his skull. Decedent showed no concern over this illness thereafter. On August 19, 1933, decedent was successfully treated for mild bladder and prostate disturbances. On January 7, 1935, after the creation of the trusts, decedent was involved in an automobile accident which resulted in shock, bruises, and a broken leg. In the fall of 1935 he had an attack of bronchial pneumonia for which he was confined for several weeks but recovered with no apparent ill effects. In 1936, however, he had another attack of pneumonia after which he never went about without a nurse. During the last two years of his life decedent was confined to his home. Decedent died on December 24, 1940, from heart failure complicated by pneumonia. In 1934, at the time of the creation of the trusts, decedent was of a cheerful and active disposition. He enjoyed traveling. In *188 earlier years he took trips in the United States and in Europe with his son. In 1931 he went on an automobile trip with two grandnephews through the eastern states and part of Canada. In 1934 decedent drove his automobile alone on trips of about 250 miles in Georgia and the Carolinas. The value of the four inter vivos trusts created on December 19, 1934, was not included in the value of the gross estate as reported in the estate tax return. The estate tax return disclosed a gross estate of $839,306.96. Respondent has assigned a valuation of $841,993.02 to the alleged transfers in contemplation of death which are here in controversy. The gross estate, as adjusted by respondent, is $1,713,999.40. The transfers to the three trusts created on December 19, 1934, for the benefit of decedent's children were not made in contemplation of death. The transfers to the trust created for the wife on December 19, 1934, were made in contemplation of death. Opinion Respondent determined that the transfers to the four trusts created on December 19, 1934, for the benefit of decedent's wife and three children, were made by decedent in contemplation of death so as to be includible in the gross *189 estate under section 811(c) of the Internal Revenue Code. The principles to be followed in determining whether transfers have been made in contemplation of death are set forth in United States v. Wells, 283 U.S. 102, 118: "* * * The words 'in contemplation of death' mean that the thought of death is the impelling cause of the transfer, * * *. If it is the thought of death, as a controlling motive prompting the disposition of property, that affords the test, it follows that the statute does not embrace gifts inter vivos which spring from a different motive. * * * It is sufficient if contemplation of death be the inducing cause of the transfer whether or not death is believed to be near. (Italics added.)" See also, City Bank Farmers Trust Co. v. McGowan, 323 U.S. 594; Allen v. Trust Company of Georgia, 326 U.S. 630. In our opinion, the transfers in trust for the benefit of decedent's three children were not induced by thoughts connected with death. The thought of death was not the impelling cause of the transfers or a controlling motive prompting the disposition of the property. The transfers of the property to the *190 trusts were made by decedent to provide independent income for his children, to equalize the gifts among them, and to reduce his income tax liability. These are purposes associated with life rather than death and in such circumstances the value of the transfers is not includible in decedent's gross estate. United States v. Wells, supra; Estate of Fletcher E. Awrey, 5 T.C. 222; Estate of Charles Delany, 1 T.C. 781, and cases therein cited at page 790. For some years prior to the creation of the trusts decedent had supported his children by making periodic payments to them. He intended the income of the trusts to replace these payments. This explains the size of the gifts. The gross income of the trusts in 1935, less trustees' fees and income taxes, was in fact a reasonable approximation of decedent's payments to his children for their support in prior years. After the creation of the trusts in 1934 decedent no longer contributed to the support of the children. The income of the trusts for the children was distributable in monthly installments to the children. The trusts were designed to relieve, and the evidence is clear that they did relieve *191 decedent of the burden of supporting the children during his lifetime. The dominant motive of decedent in setting up the trusts was to make provision for the children immediately, while he was still alive, rather than concern for what would happen to them after his death. Cf. Igleheart v. Commission, 77 Fed. (2d) 704, 709, where it was said, "A gift is to be regarded as made in contemplation of death where the dominant motive of the donor is to make proper provision for the donee after the death of the donor." Decedent's declared purpose in executing the trusts for the children was to provide an income comparable with and to replace his prior periodic gifts for their support. He expressed this purpose to the children, to the trust officer of the corporate trustee, and to the attorney drafting the trust instruments. The children were all informed that the income of the trusts was for their support and they would have to mold their scale of living to such income. As was stated in Estate of Sallie E. Walton, 42 B.T.A. 300, 303: "* * * The best evidence of the decedent's state of mind * * * and the reasons actuating him in making the transfers are the statements *192 and expressions of decedent himself, supported as such statements are by all the circumstances concerning the transfers." Respondent contends that decedent's age and execution of a will on the same day he set up the trusts are strong evidence that the transfers were made in contemplation of death. Respondent also points out that decedent was informed of the tax consequences of the creation of the trusts and that in all likelihood decedent was motivated by a desire to avoid estate taxes. The record refutes these contentions of respondent. Although decedent was 76 years old when he set up the trusts in December 1934, the evidence shows-that his so-called advanced age was not a factor prompting the creation of the trusts. United States v. Wells, supra, at page 118; Rochester H. Rogers, Executor, 21 B.T.A. 1124. The decedent delayed almost a year in executing the trust instruments from the time he informed his attorney to draft the trust agreements, a delay unnecessary if the trusts were prompted by thoughts of death. Moreover, decedent's execution of a will on the same day he created the trusts, although a factor which under some circumstances has considerable *193 significance, is not persuasive here where the evidence demonstrates that the motivating purpose for the creation of the trusts was other than contemplation of death. Anna Ball Kneeland, 34 B.T.A. 816, 821. The earlier will had to be reformed, in the judgment of the decedent, after he decided to and did create trusts for his children to provide them with necessary current income in lieu of the advances of money which the decedent had made to them in each year in the past. Under such circumstances the creation of a new will was logical and practical, and the execution thereof is not, in our opinion, a factor which is determinative of the question whether three trusts were created in contemplation of death. What evidence there is on the question of avoidance of taxes demonstrates that decedent was more interested in income and gift taxes than in estate taxes. In addition, this evidence indicates that decedent's dominant purpose was not to avoid taxes of any sort but to provide a definite income for his children. No prudent man would make a substantial transfer of his property without some consideration of the tax consequences; and "every man making a gift knows that what *194 he gives away to-day will not be included in his estate when he dies." Allen v. Trust Company of Georgia, supra. Respondent also claims that the amount of the trust funds shows that decedent created the trusts in contemplation of death. However, the size of the trusts was satisfactorily explained as being prompted by the desire to assure to the children the same amount of income which decedent had previously contributed for their support. In any event, it appears that decedent retained a considerable estate, at least equal to the amount which he transferred in trust, which was amply sufficient for his needs, and the fact that the transfers may have constituted around 50 per cent of decedent's estate does not of itself require a conclusion that the transfers were made in contemplation of death. Constance McCormick, 38 B.T.A. 308, 311. It is held that the transfers to the three trusts for the benefit of decedent's children were not made in contemplation of death. With regard to the trust created for decedent's wife, the determination of respondent that the transfers to such trust were made in contemplation of death and includible in the gross estate *195 must be sustained. The record is entirely devoid of any evidence as to the motive prompting the decedent in making the transfer to the wife. Practically all we know is that the trust was created. Petitioners assign on brief a reason that decedent created the trust for the benefit of his wife in order to treat her fairly with his children. Although at times a motive to equalize gifts may be one associated with life, as we noted previously, the record is silent of this or any other motive for the trust to the wife. We, therefore, can not infer that decedent was prompted by the same motives in creating the trust for the wife as he was in creating the trusts for the children, and with respect to the trust for the wife respondent's determination must be approved for lack of evidence. See Jacob Schneider, 35 B.T.A. 183, where respondent's determination that transfers were made in contemplation of death was approved as to one gift for lack of evidence, even though the remaining transfers in trust were held not to have been made in contemplation of death. Respondent's alternative contention that the trusts for the children should be included in the gross estate for the reason *196 that decedent's retained power to direct investments was a power to alter, amend, or revoke within the meaning of section 811(d) (2) of the Internal Revenue Code, or constituted ownership of the corpus by analogy to Helvering v. Clifford, 309 U.S. 331, is rejected on the authority of Estate of Henry S. Downe, 2 T.C. 967, a case which respondent admits is contrary to his present position. Decision will be entered under Rule 50.