ANNA BALL KNEELAND, YALE KNEELAND, JR., WILLIAMSON PELL AND UNITED STATES TRUST COMPANY OF NEW YORK, EXECUTORS OF THE WILL OF YALE KNEELAND, DECEASED, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 79748. Promulgated July 23, 1936.

*George L. Shearer, Esq.,* for the petitioners.
*J. R. Johnston, Esq.,* for the respondent.

818

OPINION.

LEECH: Respondent contends, first, that the disputed transfer was made in contemplation of death, within the meaning of section 302 (c) of the Revenue Act of 1926, as amended by section 803 of the Revenue Act of 1932. The premise of that contention is entirely factual. Whether the transfer occurred more or less than two years before decedent's death is not decisive of the question. The presumption, in either event, is against petitioners, but this presumption is rebuttable. *Heiner* v. *Donnan*, 285 U. S. 312. It is rebutted here, as we have found. The evidence establishes the purposes motivating the transfer were the reduction of income taxes, the avoidance of gift taxes, and, as a corollary thereof, the equalization of the incomes of decedent and his wife. These are purposes associated with life rather than death. *United States* v. *Wells*, 283 U. S. 102.

Decedent suffered an attack of infantile paralysis in early childhood, which left him lame, but with no organic trouble. Despite his lameness through college, he was active in the outdoor sports of tennis and horseback riding. His health was good until 1923 when

he became afflicted with rheumatoid arthritis, from which he was never cured. During this affliction, decedent was attended by highly eminent general physicians and specialists in arthritis. One of the most eminent was also his intimate personal friend. Decedent's son who was, at the time of decedent's illness and had been for several years prior thereto, a physician, also treated decedent a part of the time. This disease is a systemic infection, the source of which is unknown. It does not affect the organs of the body, but stiffens the joints and runs a course covering a maximum period of 10 years. It ordinarily "burns itself out" when the body has set up sufficient resistance to stop its progress. The effect of the disease depends largely upon the period of its activity, and thus may leave the patient with little or no apparent injury, with enlarged or partially stiffened joints, or, in severe cases, a permanent cripple. The ailment does not cause death, nor necessarily shorten life. Decedent was advised by his physicians of this diagnosis and prognosis first in 1924 and many times thereafter during his life. He always believed it to be true. Frequently, before and after the transfer in question, as late as a month before his death, decedent indicated his belief that the disease would not be fatal. As the ailment progressed, decedent underwent several operations on his knees, to improve their mechanical use. The last of these operations occurred during 1929. He recuperated normally and was benefited by each of these operations, but used a wheel chair a part of the time. In late 1927 decedent contracted pleurisy, resulting from treatment for his arthritis. During the summer of 1928 he recouped his weight and ordinary health lost by the attack of pleurisy. There was no marked change in his arthritis during 1930, 1931, and 1932. His heart, lungs, abdomen, and blood pressure were normal, and, except for the arthritis, he was in very good physical condition, for a man of his years, during that time.

While at his farm in Vermont, about July 20, 1933, decedent took an apparently slight cold, followed shortly by a hemorrhage of the lung. It was first thought he had tuberculosis. Decedent did not believe this. He was brought back to New York on September 20, 1933. After extensive tests, it was found the hemorrhage resulted from a bronchiectasis. This development was neither known nor suspected by the physicians or decedent. After these tests, it was decided that decedent was suffering, not from tuberculosis, but from pneumonia, possibly a chronic pneumococcus or pneumonia germ infection of the chest. This latter diagnosis was confirmed about December 20, 1933. On December 22, 1933, it was pronounced terminal pneumonia, from which decedent died December 26, 1933. He was bedridden from the date of the hemorrhage, in July 1933.

During the summer of 1933, at the farm in Vermont, decedent, with his wife, planned the celebration of their fortieth wedding anniversary for 1935, and a trip to China as soon as the arthritis had finished its course. On being taken from the farm to New York, decedent indicated his expectation of returning the next summer. He was consistently optimistic, and expected to live and enjoy life, free from the pain, discomfort and inconvenience of arthritis, when that had run its course. He sold his seat on the New York Produce Exchange in August 1933, after the hemorrhage, for $2,100, although the amount of the gratuity fund maintained in connection with the exchange, payable to decedent's family at his death, was $5,360. Decedent had engaged in the export grain business until 1925 when, because of its uncertainty, he retired from that business and invested his large estate in stocks and bonds. He placed these in the hands of the United States Trust Co. of New York, as his agent, to collect his income and keep his account. He continued thereafter to direct all purchases and sales for his account.

The respective incomes of decedent and Mrs. Kneeland for the following years was:

|      | Kneeland | Mrs. Kneeland |
|------|----------|---------------|
| 1930 | $186,782.96 | $36,729.96 |
| 1931 | 162,979.74 | 36,091.14 |
| 1932 | 93,455.03 | 48,175.92 |
| 1933 | 68,822.85 | 50,884.86 |

Decedent's brother-in-law, Williamson Pell, was vice president of the United States Trust Co. of New York, and a very intimate personal friend of decedent. On Pell's advice, for the purpose of reducing income taxes, decedent had created several trusts for his two children. (See *Emily J. Pratt et al., Executrices*, 18 B. T. A. 377.) The last two of these trusts were created for his son in November and December 1929. When decedent died, the annual income payable to each of his children from these trusts was about $15,000.

Decedent was a collector of first editions, and his wife, who, before the present transfer, had a substantial income of her own, collected porcelains. They exchanged many such gifts. During 1929 and 1930 decedent gave his wife porcelains costing him approximately $36,000. His brother-in-law, and vice president of the United States Trust Co. of New York, Williamson Pell, knew of decedent's habit of spending these large amounts on presents for his wife, and that it would probably continue. Pell and decedent knew of the provisions in the then pending Revenue Act of 1932, reenacting gift taxes. Pell

advised decedent to create a trust for his wife, for the purpose of effecting a saving in his income tax, and possibly a gift tax, and equalize the respective incomes of decedent and his wife. At decedent's direction, Pell drew and submitted the trust in question. After its execution, decedent and his wife paid for their respective gifts to each other of first editions and porcelains. Neither decedent nor Pell, before or after the execution of the disputed trust, indicated any purpose of avoiding death taxes. The only objects of the trust discussed by decedent or Pell at either time were those that we have found motivated the transfer.

Although an examination of the facts in other cases is not always helpful in determining motive (*B. Paul Mossman, Executor*, 32 B. T. A. 596), it may be so in learning the attitude and approach of the courts to the question.

Thus, the facts here are certainly no less strong for petitioners than those in *United States* v. *Wells, supra*. True, decedent executed a new will simultaneously with the trust, making changes in an earlier will, occasioned by the trust. But, though that fact might, under some circumstances, have considerable significance (*Edgar A. Igleheart et al., Executors*, 28 B. T. A. 888; affd., 77 Fed. (2d) 704), it is not controlling. Particularly is this so, where, as here, the record demonstrates so clearly the motivating purpose for the creation of the trust to have been other than contemplation of death within the meaning of the controlling statute. That, and that alone, is decisive here. Having reached that conclusion as to the object of the trust, the new will was simply its logical practical complement.

Respondent urges that the pneumonia infection from which decedent died was a direct or indirect derivative of the same germ causing decedent's arthritis. Although the pleadings, as constituted, tend to establish this as a fact, the testimony, admitted without objection, seems to seriously question, if not wholly contradict its accuracy. In any event, such fact, even if proved, is not controlling and does not disturb the premise upon which our factual conclusion is based. That premise is that decedent, throughout his lifetime, at least until after his execution of the pending trust, was informed and believed that the rheumatoid arthritis, from which he was then suffering, would not cause his death nor shorten his life.

The contention of the respondent that the transfer was one to "take effect in possession or enjoyment at or after death" is without merit. The transfer, in so far as the decedent was concerned, was absolute. He had no further interest in the trust corpus even if his wife should predecease him. Upon that event it would go in equal shares to his two children. Under this conveyance, decedent's wife was entitled

to the entire income of the trust property from the date of the execution of the instrument for the full term of her life and her right to enjoy the income was subject to change by no power reserved by the grantor to himself or granted by him to a third party. At most, the interest retained by the grantor under the instrument was no more than "a mere possibility of reverter" predicated upon the contingency that his wife might, during his lifetime, exercise hei power to revoke the trust. This contingency was beyond his legal control. At his death, without its occurrence, no interest passed from his possession, enjoyment or control. There is no basis for the contention that the transfer was one to take effect in possession or enjoyment at or after the grantor's death. The recent decision of the United States Supreme Court in *Helvering* v. *St. Louis Union Trust Co.*, 296 U. S. 39, is controlling on this point. In that case the Court, in a situation substantially similar to that here presented, said:

If, therefore, no interest in the property involved in a given case pass "from the possession, enjoyment or control of the donor at his death," there is no interest with respect to which the decedent has created a trust intended to take effect in possession or enjoyment at or after his death. The grantor here, by the trust instrument, left in himself no power to resume ownership, possession or enjoyment except upon a contingency in the nature of a condition subsequent, the occurrence of which was entirely fortuitous so far as any control, design or volition on his part was concerned. After the execution of the trust he held no right in the trust estate which in any sense was the subject of testamentary disposition. His death passed no interest to any of the beneficiaries of the trust, and enlarged none beyond what was conveyed by the indenture. His death simply put an end to what, at best, was a mere possibility of a reverter by extinguishing it—that is to say, by converting what was merely possible into an utter impossibility. * * *

The third position of respondent is that under the transfer in trust the enjoyment by the beneficiary of the interest conveyed was subject, at the time of decedent's death, to a change through the exercise of a power, either by the decedent alone or in conjunction with another person, to revoke the trust.

This contention is premised upon that provision of the trust instrument, set out in the findings of fact, which specifically grants to the beneficiary, and the beneficiary alone, the right to revoke the trust. Thus the sole question is whether or not the power to revoke, granted to the beneficiary of the trust but neither reserved by the grantor to himself nor subject to exercise by him, constitutes here a reservation under the trust instrument, of power by the grantor to cause its revocation.

It is argued that the granting of a power to the beneficiary in circumstances such as these, where the beneficiary is the wife of the grantor, and through her love and affection may be induced to carry

out the grantor's wishes to the extent of execution of any instrument which he may wish executed, is equivalent to a reservation of a power to revoke. We are told that, under such conditions, the grantor has the power, and may exercise it at any time, to repossess himself of the property conveyed.

It may possibly be true that such condition exists and that the decedent could, at any time after the execution of this trust indenture, have induced his wife to execute a revocation of the trust. However, if he possesses this power it is in no sense a legal power and certainly is not a power reserved to him under the trust instrument. Such a power is one that comes of the association of the individuals and the love and affection borne by each to the other.

There is no indication that any such power as this was contemplated by Congress in its enactment of the section of the statute relied upon by respondent. We know of no authority for the proposition, that a husband's influence over his wife through her love and affection for him, sufficient to secure a release to him of her legal rights, constitutes a legal power to alter or impair her right of enjoyment of her property. None of the cases cited by the respondent support this theory. Its soundness is shattered by the recognition that a husband can legally complete a gift to his wife. See *Bingham* v. *White*, 31 Fed. (2d) 574.

If there were any doubt upon this question, it is decided by the recent decision of the Supreme Court in *White* v. *Poor*, 296 U. S. 98. There the transfer in trust contained no reservation of power to the grantor to amend or revoke. That power was granted to the trustees, alone. After the execution of the instrument, one of the trustees resigned and those remaining exercised the power granted in the trust to appoint a new trustee. They designated the grantor as trustee to fill the vacancy. Thereafter the grantor, as trustee, possessed the power, in conjunction with the other trustees, to terminate the trust. The Supreme Court held that the power possessed by the grantor, at her death, to thus participate in the termination of the trust was not reserved to her under the trust instrument within section 302 (d), *supra*, but was received subsequently through action of the trustees and beneficiaries. See also *Helvering* v. *Helmholz*, 296 U. S. 93; *Valentine Bliss*, 26 B. T. A. 731.

*Decision will be entered for the petitioners.*