ESTATE OF C. FINLEY TALBOT, DECEASED, CHARLES FINLEY TALBOT, JR. AND RUTH M. TALBOT, ADMINISTRATORS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Talbot v. Commissioner
Docket No. 10811-80.
United States Tax Court
T.C. Memo 1981-560; 1981 Tax Ct. Memo LEXIS 183; 42 T.C.M. (CCH) 1263; T.C.M. (RIA) 81560; September 29, 1981. *183 Decedent transferred $ 253,416.35 worth of stock in a family owned corporation to his three children and their families within 3 years of his death. Held, because the transfers were motivated by a concern for the financial security of his children and by a desire to minimize decedent's income and gift taxes, the transfers were not in contemplation of death within the meaning of sec. 2035, I.R.C. 1954. Jackson L. Boughner, for the petitioner. David M. Kirsch, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: By statutory notice dated May 27, 1980 respondent determined a deficiency in estate tax due from petitioner in the amount of $ 77,788.20. The sole issue for our decision is whether stock transferred by decedent within 3 years of his death was transferred in contemplation of death within the meaning of section 2035, I.R.C. 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Decedent Charles *185 Finley Talbot died testate on March 29, 1978. Petitioner, the Estate of C. Finley Talbot, is an estate probated in the State of Florida. Ruth M. Talbot, a resident of Naples, Florida at the time of filing the petition herein, and Charles Finley Talbot, Jr., a resident of Dearborn, Michigan at the time of filing of the petition herein, are co-administrators of the estate. A Federal estate tax return was timely filed with the Atlanta Service Center at Chamblee, Georgia. Prior to 1969 decedent was vice-president of McIntosh Stamping Corporation (hereinafter McIntosh or McIntosh, Inc.) a Michigan corporation which manufactured heavy steel stampings for trucks and military vehicles. McIntosh, Inc. was a family owned corporation, formed in 1937 by decedent, his father-in-law and his brother-in-law. Decedent and his wife, Ruth M. Talbot (hereinafter Mrs. Talbot) owned 118,670 shares of stock in the corporation, which constituted a significant percentage of the outstanding stock of the company during the early 1970's. In the fall of 1969, decedent and his wife moved to Naples, Florida. Decedent resigned his position as vice-president of McIntosh Stamping Company in early 1970 and *186 became a consultant to that company until August 1975, at which time he became fully retired. Sometime after moving to Florida decedent and his wife discussed the prospect of making large gifts of the McIntosh stock to their children. All of their children at that time either were buying or building homes. The Talbots decided that they would make gifts of $ 30,000 to each of their 3 children and their respective spouses. After further consideration of the gifts, decedent and his wife chose to postpone them until after decedent's retirement, at which time they would know exactly whether the retirement benefits then to be received would satisfy their needs. By March or April of 1976 the Talbots had ascertained their retirement status, finding that the benefits received were sufficient to allow large gifts to their children and grandchildren. Decedent was survived by his wife and 3 children, Charles Finley Talbot, Jr., born May 2, 1936, Gay Smith, born May 23, 1938 and James A. Talbot, born October 13, 1944. Decedent's eldest son, Charles F. Talbot, Jr., was a graduate of MIT and the Harvard Business School. He was employed by Ford Motor Company in Dearborn, Michigan at the *187 time of the gifts. In November of 1976, Charles F. Talbot, Jr. owed approximately $ 46,000 on his home mortgage. He also owed $ 9,200 plus interest on funds borrowed for investment purposes. His 1976 Federal income tax return, filed jointly with his wife, reflected salary of $ 78,750.60 and adjusted gross income of $ 86,210.31. Their 1975 return reflected salary of $ 65,661.32 and adjusted gross income of $ 70,950.60. Charles F. Talbot, Jr.'s net worth in 1976 was approximately $ 335,000. Gay Smith, decedent's daughter, was married to Robert M. Smith, a graduate of Purdue University, who was employed as an engineer by General Motors Corporation in Michigan. In 1976 Robert M. Smith owed approximately $ 37,000 on a home mortgage.Gay and Robert M. Smith's 1976 Federal income tax return reflected adjusted gross income of $ 34,321. Their 1975 return reflected adjusted gross income of $ 26,604.73. Robert M. Smith's estimated net worth in 1976 was $ 100,000. The Smiths had 3 children. James A. Talbot, decedent's youngest child, was 32 years old at the time of the gifts. He was a graduate of the University of Michigan, and was employed by Ford Motor Company in Michigan. James *188 A. and Marilyn Talbot's 1976 Federal income tax return reflected adjusted gross income of $ 28,094.52. Their 1975 return reflected adjusted gross income of $ 22,797.51. While vacationing in Michigan in the summer of 1976, decedent discussed the intended gifts with his 2 sons, his daughter and his son-in-law. During his conversations with Charles F. Talbot, Jr., decedent expressed interest in his son's indebtedness and in his son's plans to enter the investment business. Robert M. and Gay Smith discussed with decedent their need for funds to pay off their home mortgage. During the vacation, decedent also expressed the desire that his grandchildren be properly educated. He communicated this wish to his daughter Gay Smith and her husband Robert. From 1974 until the end of 1976, the price of McIntosh stock rose dramatically. The selling price of McIntosh stock at the end of 1975 was $ 6.87 per share. During 1976 it rose from a price of $ 11 per share on April 30 to $ 22.50 per share at the end of the year. On the date of the gifts, November 16, 1976, the price of the McIntosh stock was approximately $ 16.69 per share. Due to the success of McIntosh, Inc., the company was *189 mentioned in an article in Fortune magazine at sometime prior to the date of the gifts at issue. There-after, a number of large companies became interested in purchasing the stock of McIntosh, Inc. Consequent acquisition rumors kindled the swift rise in the price of the McIntosh stock during 1976. In the fall of 1976 decedent's broker informed him of the rumors, but at the time of the gifts it was unclear whether the expected acquisition would be by cash, stock or a mixture of both. The officers of McIntosh, Inc. were not allowed to disclose any information with respect to the purchase negotiations to decedent or his wife prior to early December 1976, at which time the officers contacted decedent and his wife in order to ascertain their attitude toward a cash sale. However, plans for a cash sale fell through, and in June of 1977 Norris Industries acquired McIntosh, Inc. by exchanging 4 shares of its stock for 5 shares of McIntosh stock. On November 16, 1976 decedent transferred 2,405 shares of McIntosh, Inc. stock to each of his 3 children and to each child's respective spouse. Thus, each couple received 4,810 shares from decedent. He also transferred 108 shares of McIntosh *190 stock to each of his 7 grand-children on the same date. The total number of shares transferred by decedent on that date was 15,186, with a total value of $ 253,416.35. These transfers were all reported on a Federal gift tax return filed by decedent for the fourth quarter of 1976. Identical transfers by decedent's spouse also were reported on a Form 709 Federal gift tax return by Mrs. Talbot, meaning that each donee couple received a combined total of 9,620 shares. The aggregate value of the gifts represented approximately 22-1/2 percent of the Talbot's total assets. Decedent was 66 years old at the time of such transfers. On March 29, 1978 decedent died abruptly of a massive heart attack at the age of 67. Prior to the gifts of November 16, 1976 the decedent made the following gifts: Year
Total gifts for year
Donees
1975
$ 21,700 (approx.):
$ 2,800 (approx.)
3,100 shares at approx. 7
to each child and to
each child's spouse;
$ 700 to each grandchild
1974
$ 3,600 (approx.): 600
$ 600 (100 shares) to
shares at approx. 6
each child and each
child's spouse
1973
$ 11,250 (approx.): 2,250
$ 1,875 (375 shares)
shares at approx. 5
to each child and
each child's spouse
1972
Less than $ 18,000:
300 shares to each
1,800 shares
child and each child's
spouse
1971
Less than $ 18,000:
300 shares to each
1,800 shares
child and each child's
spouse
1970
Less than $ 18,000:
366 shares to each
2,196 shares
child and each child's
spouse
1966
$ 30,000 cash gift to
Gay Smith
daughter, Gay Smith
1958
$ 13,000 gift of ten year
James A. Smith
income interest in stocks
to trust for son, James A.
Talbot (Reversion to
donor)
*191 The evidence demonstrates that decedent enjoyed a physically active life up until his sudden death. He suffered a mild heart attack in 1967, after which he was hospitalized for a period of 5 weeks. From that time until his death, decedent had no serious illnesses. He played golf 5 to 6 times a week, pulling his own cart. He was a regular participant in both a bowling league and a bridge club. Decedent had reservations to play tennis on the afternoon of the day he died and played golf on the day before. A medical report dated October 13, 1976 stemming from a radiological consultation stated: A few fibrotic areas are noted on the lung shields, otherwise the lungs are clear and the cardiac shadow is within normal limits. Impression: Essentially normal chest except for a few non-specific fibrotic changes and there has been essentially no change since 10/6/75. Decedent's physician, Robert N. Ricketts, M.D., concluded as a result of a physical examination conducted on or about October 25, 1976 that the decedent's condition at that time was stable. Decedent was also mentally alert. Besides playing duplicate bridge, he represented his golf club before the city council on *192 zoning matters and had just completed a comprehensive modernization plan for such club shortly before his death. Mrs. Talbot handled most of the account responsibilities for her husband and herself. After 1969 she filled out their annual income tax returns. Additionally, she filled out the gift tax return for the 1976 gifts. In 1973 the Talbots consulted an attorney and a certified public accountant, and on March 12, 1973 Mr. Talbot executed a will and a trust. The trust was funded by the transfer of assets from an existing Michigan trust and provided for the creation of a marital deduction trust. However, on June 3, 1977 Mr. Talbot executed an amendment to the trust which eliminated the marital trust provision. In a handwritten "supplementary sheet for Schedule G" signed by Ruth McIntosh Talbot on December 26, 1978 and attached to the gift tax return the following were set forth as Mrs. Talbot's explanation of the motives behind the subject transfers: 3. To help all three children to buy homesgifts in '75 and '76. 4. A prospect of large capital gains. Family owned company might be sold for cash. 5. Reduce income taxes in general. Family owned company might be *193 sold for cash. 6. Reduce Florida intangibles tax.
7. Anticipated 1976 changes in federal gift tax laws by Congress. Respondent, in his notice of deficiency, determined that decedent's gifts were includable in his gross estate pursuant to section 2035 because the transfers were made in contemplation of death. The value of the gifted shares was determined pursuant to section 2031 of the Code, and, accordingly, the taxable estate was increased by $ 286,577.20.
OPINION The single issue presented for decision in this case is whether the transfers by the decedent of the McIntosh stock were made in contemplation of death within the meaning of section 2035. Respondent contends that the transfers were made in contemplation of death because they were effectuated as a substitute for a testamentary disposition of property and for the purpose of avoiding estate taxes. Petitioner argues that the transfers were motivated by lifetime concerns since the impetus behind the transfers was to provide financial assistance to decedent's children and to reduce decedent's state and Federal income taxes and state property taxes. Section 2035 provides that the value of the gross estate shall *194 include the value of all property transferred by a decedent in contemplation of death. It further creates a rebuttable presumption that any transfer, regardless of its size in proportion to the total amount from the gross estate, made by a decedent within 3 years preceding the date of his death is a transfer made in contemplation of death. [2]
*195 The presumption is one of law, rather than fact, and therefore is not evidence in and of itself. Estate of Gerard v. Commissioner, 57 T.C. 749, 757 (1972), affd. per curiam 513 F.2d 1232 (2d Cir. 1975). However, the estate or party challenging the determination of the Commissioner must not only come forward with evidence that the gift was not made by the decedent in contemplation of death but must also bear the burden of proof on the matter. McCaughn v. Real Estate Land Title & Trust Co., 297 U.S. 606, 607 (1936); Estate of Lynch v. Commissioner, 35 T.C. 142, 150 (1960). A transfer is in contemplation of death if the thought of death is the dominant motive impelling the decedent to make the transfer. Such motive need not be the sole motive; however, if the gift springs primarily from purposes associated with life, it is not made in contemplation of death within the meaning of section 2035. United States v. Wells, 283 U.S. 102, 116-117 (1931); Estate of Gerard v. Commissioner, supra at 758. According to section 20.2035-1(c), Estate Tax Regs., a transfer is prompted by the thought *196 of death if made with the purpose of avoiding death taxes, made as a substitute for a testamentary disposition of property, or made for any other motive associated with death. The state of mind of decedent as of the date of the transfer is a question of fact to be resolved from a consideration of all facts and circumstances present in the case. Sec. 20.2035-1(c), Estate Tax Regs.; Allen v. Trust Co. of Georgia, 326 U.S. 630, 636 (1946); United States v. Wells, supra at 119; Estate of Hill v. Commissioner, 64 T.C. 867, 877-879 (1975). An exhaustive review of the record herein convinces us that decedent's dominant motives in making the transfers at issue were associated with life and that the thought of death was not an impelling motive for the transfers. In planning the gifts, decedent originally was motivated by a desire to relieve his children from the financial burdens incident to the building and buying of homes. Such gifts understandably were deferred for 2 years until after decedent's retirement, after which time decedent made his intentions known to his children. In discussing their needs with them, decedent found, *197 at least in the cases of his eldest son and his daughter, that gifts of $ 30,000 per couple as originally planned would have been insufficient to pay off their home mortgages. By the time of decedent's retirement, the McIntosh stock, which comprised the bulk of decedent's wealth, had more than doubled, and eventually would triple, in value. This circumstance enabled decedent to increase the value of the planned gifts without increasing the quantity of stock he originally had intended to transfer.The intervening appreciation of stock between the original donative impulse and the culminating act did not, however, magically transform decedent's lifetime objectives into those associated with death. Rather, the dramatic rise in the price of the McIntosh stock allowed decedent to consider additional needs of his children beyond their immediate indebtedness. When discussing his gift-giving intentions with his children, decedent learned that his eldest son's desire to enter the investment business had been frustrated by a lack of funds. Decedent also expressed a strong desire that his grandchildren be properly educated. The subsequent gifts provided for the fulfillment of these desires, *198 as well as for the financial security of his children and their families.
We find that the transfers by decedent were directed primarily toward the needs of the donees. It is well established that a gift motivated by a concern for the comfort and welfare of one's children is motivated by a lifetime objective. United States v. Wells, supra at 118; Estate of Ford v. Commissioner, 53 T.C. 114, 117 (1969), affd. 450 F.2d 878 (2d Cir. 1971); Estate of Moir v. Commissioner, 47 B.T.A. 765, 771 (1942). Likewise, a gift made to assist a child in a business enterprise is for lifetime purposes. Commercial National Bank v. Commissioner, 36 B.T.A. 239, 243 (1937); Estate of Siegel v. Commissioner, 19 B.T.A. 683, 687 (1930). Additionally, gifts to provide for the education of children and grand-children are not in contemplation of death. Estate of Wilson v. Commissioner, 13 T.C. 869, 871 (1949), affd. per curiam 187 F.2d 145 (3d Cir. 1951). The focus of decedenths donative gesture was upon the immediate and near future needs of his children. In addition, the *199 gifts advanced certain other lifetime objectives of decedent. By 1976 McIntosh, Inc. was attracting a great deal of attention from prospective purchasers. Rampant acquisition rumors stimulated the rapid growth in the price of the company's stock. Decedent was unable to obtain specific information about the form of the takeover other than a statement by his broker that there had been an offer for cash.Such a buyout would have generated enormous capital gains to decedent, some of which he could have avoided by completing the planned transfers before the acquisition date. Because at least two of decedent's children were in relatively low income tax brackets (the taxable income of Charles, Jr. was not in evidence), and because the huge capital gains from a cash purchase would have pushed decedent into a higher bracket, the gifts would have reduced the overall capital gains taxes had a cash acquisition taken place. The reduction of income taxes, both state and Federal, is a recognized lifetime motive. Estate of Sheldon v. Commissioner, 27 T.C. 194, 199 (1956); Estate of Farnum v. Commissioner, 14 T.C. 884, 888 (1950); Estate of Scheuer v. Commissioner, 9 B.T.A. 486, 490 (1927); *200 Kniskern v. United States, 232 F.Supp. 7, 13 (S.D. Fla. 1964). Gift tax considerations also prompted the transfers, for the decedent timed the gifts in order to avoid the anticipated changes in the gift tax laws wrought by the 1976 Tax Reform Act. Such an objective similarly evidences a concern for lifetime consequences. Estate of Kneeland v. Commissioner, 34 B.T.A. 816, 821 (1936). [3]
The objective factors present in this case support a finding that decedent made the gifts with a lifetime motive. Decedent *201 was 67 years old at the time of his death and considered himself in fine health. He was both physically active and mentally alert.His optimism is evidenced in part by his development of a modernization plan for his golf club, and his positive attitude about his health is evidenced by the active and vigorous life that he led. Decedent had no premonition of the sudden death that would strike him down shortly before a planned tennis match. His opinion of his health and his otherwise optimistic disposition are not indicative of an anticipation of death but rather show a powerful enthusiasm for life. This attitude is a factor that weighs heavily in favor of petitioner. See Estate of Zaiger v. Commissioner, 64 T.C. 927, 941 (1975). Estate of Ford v. Commissioner, supra at 123. [4]
Mention should be made of the fact that decedent had established a long practice of generosity toward his children. This is also a factor in petitioner's favor. United States v. Wells, supra at 119-120; Estate of Hill v. Commissioner, 64 T.C. 867, 878 (1975). *202 We are mindful of the fact that the transfers at issue far exceeded in value decedent's prior gifts, but we hasten to point out that when the gifts in question were originally conceived, they were not greatly disproportionate to prior gifts. The value of the gifts grew only as the value of the shares tentatively designated for transfer grew.Where a donor previously has intended to transfer property, the subsequent fulfillment of that intention usually will not affect the lifetime motives of the original plan. See Estate of Hill v. Commissioner, supra at 878; Estate of Casey v. Commissioner, 25 T.C. 707, 719 (1956). [5] The mere fact that the property designated for transfer appreciates between the conception of the gift and its completion should not change this result. If nothing else, such prior gifts demonstate that decedent concerned himself with his children's welfare over the years. We found petitioner's witnesses to be both trustworthy and forthright. Based upon their credible testimony, the entire record, and the foregoing considerations, we find *203 that petitioner has carried its burden of proof by establishing to our satisfaction that the gifts were not made with the purpose of avoiding estate taxes, as a substitute for a testamentary disposition, or for any other motive associated with death. In short, the gifts were not made in contemplation of death but in contemplation of life. Accordingly, Decision will be entered under Rule 155. Footnotes
1. This case is governed by sec. 2035 as in effect prior to its amendment by the Tax Reform Act of 1976 because the transfers at issue were consummated before Jan. 1, 1977. Sec. 2035, as so amended, only applies to gifts made after such date. See sec. 2035(c)↩.
2. Sec. 2035, as in effect during the year at issue, provided as follows: SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH (a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death. (b) Application of General Rule.--If the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, relinquished a power, or exercised or released a general power of appointment, such transfer, relinquishment, exercise, or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section and sections 2038 and 2041 (relating to revocable transfers and powers of appointment); but no such transfer, relinquishment, exercise, or release made before such 3-year period shall be treated as having been made in contemplation of death.↩
3. See also Estate of Hardesty v. Commissioner, a Memorandum Opinion of this Court dated Apr. 15, 1952; Estate of O'Neal v. Commissioner, a Memorandum Opinion of this Court dated June 24, 1947; and Estate of Howell v. Commissioner, a Memorandum Opinion of this Court dated Jan. 28, 1943. Awareness of gift tax consequences would seem to imply awareness of estate tax consequences, but such knowledge is not fatal. Where there are motivations associated with life, mere awareness of estate tax ramifications will not cause inclusion in the gross estate. Allen v. Trust Co. of Georgia, 326 U.S. 630, 635↩ (1946).
4. See also Estate of Halbach v. Commissioner, T.C. Memo. 1980-309↩.
5. See also Estate of Crum v. Commissioner, T.C. Memo. 1969-187↩.