ESTATE OF RUSSELL E. HUTCHINSON, PHILLIP E. HUTCHINSON AND RICHARD A. HUTCHINSON, CO-EXECUTORS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Hutchinson v. Commissioner
Docket No. 13925-82.
United States Tax Court
T.C. Memo 1984-55; 1984 Tax Ct. Memo LEXIS 618; 47 T.C.M. (CCH) 1018; T.C.M. (RIA) 84055; February 1, 1984. David F. Rees and Robert G. Elrod, for the petitioners. Elsie Hall, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: In a statutory notice of deficiency dated March 18, 1982, respondent determined a deficiency of $25,907.83 in the Federal estate taxes due from petitioner-estate. The issues for resolution are: (1) Whether section 2035, [1] as in effect prior to the Tax Reform Act of 1976, applies to certain transfers made prior to December 31, 1976, where the transferor's death occurred on or after January 1, 1977, and within 3 years of the date of those transfers, and if so; (2) Whether the transfers by decedent of certain real property, given by him to two of his children, were made in contemplation of death within the meaning of section 2035. *620 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Russell E. Hutchinson (decedent) died testate on August 4, 1978. Phillip E. Hutchinson and Richard A. Hutchinson (petitioners), two of decedent's children, are the duly appointed and acting co-executors of decedent's estate. Phillip and Richard resided in Indiana at the time the petition herein was filed. An estate tax return (Form 706) was timely filed on behalf of decedent's estate with the Internal Revenue Service Center, Memphis, Tennessee. Decedent was survived by seven children borne of his marriage to Aletha Hutchinson, to wit, Thomas C., Phillip E., and Richard A. Hutchinson, Linda Katharine App, Sylvia S. Miller, Janet C. Ingle, and D. Claire Marchant. For some period of time beginning prior to 1964, decedent and his brother, Roland Hutchinson, were co-owners of a business named Premier Hybrids (Premier) and several parcels of farmland. Decedent was essentially in charge of Premier, which produced, processed, and marketed farm seeds, and Roland was in charge of farming the land. In 1973 *621 the brothers dissolved their partnership.As a result of this dissolution, decedent received the farm seed business and 200 acres of farmland, and Roland received the balance of the farmland. Decedent continued to operate Premier, and Roland continued to farm the land, including much of decedent's farmland, which Roland rented for approximately $75 per acre through the date of decedent's death. In April 1974, decedent's first wife, Aletha, was informed by her doctors that she had terminal cancer and a life expectancy of only a few months. In the following months, decedent devoted much of his time to caring for Aletha, and in the later part of 1974, decedent turned over control of Premier to his sons, Phillip and Richard. Aletha died on January 29, 1975. Decedent continued to assist in the operation of Premier on a part-time basis through at least 1976. From 1967 to 1975, decedent made three gifts of real property located in Indiana to his children who wanted to build homes on the gifted property as follows: Date
Donee
Acres
1967
Phillip
1.44
8-72
Richard
10.00
1-1-75
Janet
5.00
On April 7, 1975, decedent executed a will drafted by his attorney, *622 Robert G. Elrod. The distributive provisions of that will provided, inter alia, that Thomas and Sylvia were to each receive 41.19 acre tracts of farmland located in Marion County, Indiana, and that Phillip, Linda, Janet, and D. Claire were to also receive specified tracts of real property located in Indiana. The will did not provide for Richard, who had already been given 10 acres of property, to receive any more real property. On April 29, 1974, decedent gave 6.83 acres of real property, on which Premier was located, to his seven children in equal shares. On June 10, 1975, decedent wrote to Elrod requesting him to prepare a "schedule for disposing of my real property to the children to whom each parcel is willed so as to incur the least tax." In response to this letter, Elrod requested and decedent provided valuations of the various parcels of real estate.Elrod then advised decedent that the proposed transfters would result in a gift tax of approximately $18,250. For each of the gifts to his children made prior to this time, decedent claimed part of his specific exemption and paid no gift tax. After he learned of the probable tax liability triggered by the proposed transfers, *623 with one exception, decedent made no further gifts prior to December 30, 1976. The single exception was that in July 1975, decedent gave Phillip the real property that he was to receive under the terms of the will. In November 1976, decedent was referred by his regular physician to Dr. Douglas H. White, an internist with a particular interest in cardiology. Decedent stated that he had heart disease and complained of being tired and short of breath. Following an examination, White determined that decedent's heart was enlarged, that his mitral value was not performing properly, that his heart beat erratically, and that he had mild congestive heart failure, which meant that his blood was not being adequately circulated. In addition, White noted that decedent was still depressed about the death of Aletha. At the time of the examination, decedent was taking Lanoxin, a medication that slows the heart rate down and makes the heart muscle contract more forcefully, and Lasix, a diuretic. White ordered decedent to continue both of these medications and prescribed Triavil, an antidepressant. White also ordered several tests that he considered routine for new patients, including an *624 electrocardiogram, a chest x-ray, a blood count and an urinalysis. At the conclusion of the examination, White suggested that decedent be reexamined every 3 to 6 months. The results of the tests were not communicated to decedent, however, until sometime in January 1977. In the latter part of 1976, Elrod advised decedent that, because of the enactment of the Tax Reform Act of 1976, decedent should consider making any contemplated gifts prior to January 1, 1977. On December 30, 1976, decedent made gifts to Thomas and Sylvia of the real property that each of them was to receive under the provisions of his will. At the time of these transfers, Thomas and Sylvia resided in Missouri and Wisconsin, respectively, where they continued to reside through the time of trial. Roland, who had rented and farmed both of these parcels prior to the gifts, continued to rent these parcels. After Aletha's death and through 1976, decedent was mentally alert, lived alone, took care of his own personal needs, and engaged in social visits with friends. During this period, decedent's physical appearance did not indicate that his health was impaired, and he never complained to his children of any illness *625 or other problems with his health. In June 1977, decedent began courting Lillian Maze (Lillian), a lifetime friend, and on December 31, 1977, they were married. For approximately 1 year, they traveled, entertained, and enjoyed various activities together. On July 11, 1978, decedent was admitted to Methodist Hospital in Indianapolis, Indiana, because of abdominal pain. On August 4, 1978, he underwent an operation to replace the mitral valve in his heart. Decedent failed to survive that surgery, succumbing at age 71. At the time of his death, decedent was survived by a brother, age 61, and a sister, age 68. His father had died at age 86 of heart disease, and his mother had died at age 87 of parkinsonism. The value of the real property transferred to Thomas and Sylvia on December 30, 1976, was not included in decedent's bross estate reported on the Federal estate tax return prepared by Elrod and signed by Phillip and Richard as co-executors of decedent's estate. Schedule G of that return contained the following statement: Co-Executors contend that * * * [the transfers of real property to Thomas and Sylvia] are not includable in decedent's gross estate for estate tax *626 purposes because the gifts were consistent with a pattern established by decedent of dividing his property among his children while in good health, and were not made in contemplation of death. In his notice of deficiency, respondent determined that the December 30, 1976, transfers of property to Thomas and Sylvia were made in contemplation of death and that the value of those transfers is includable in decedent's gross estate under section 2035(a). ULTIMATE FINDING OF FACT The transfers of the aforementioned property to Thomas and Sylvia by decedent were made in contemplation of death. OPINION Issue 1 -- Applicability of Section 2035
The first issue for resolution is whether section 2035, as in effect prior to the Tax Reform Act of 1976, applies to the transfers of real property to Thomas and Sylvia. Prior to the passage of that Act, section 2035 (former section 2035) provided as follows: SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH. (a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an *627 adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death.
(b) Application of General Rule.--If the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, relinquished a power, or exercised or released a general power of appointment, such transfer, relinquishment, exercise, or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section and sections 2038 and 2041 (relating to revocable transfers and powers of appointment); but no such transfer, relinquishment, exercise, or release made before such 3-year period shall be treated as having been made in contemplation of death. [Emphasis supplied.] Section 2035 was amended by section 2001(a)(5) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1848 to eliminate the "contemplation of death" concept and replace it with a simple 3-year rule: SEC. 2035. ADJUSTMENTS FOR GIFTS MADE WITHIN 3 YEARS OF DECEDENT'S DEATH. (a) Inclusion of *628 Gifts Made by Decedent.--Except as provided in subsection (b), the value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, during the 3-year period ending on the date of the decedent's death. Congress provided that amended section 2035 "shall apply to the estates of decedents dying after December 31, 1976; except that * * * [amended section 2035] shall not apply to transfers made before January 1, 1977." Tax Reform Act of 1976, Pub. L. 94-455, sec. 2001(d)(1), 90 Stat. 1520, 1854. Petitioners advance the following two-step argument: (1) Former section 2035 is inapplicable to estates of decedent's dying after December 31, 1976, and (2) amended section 2035 does not apply to transfers made before January 1, 1977. Petitioners conclude that because decedent died after December 31, 1976 (i.e., on August 4, 1978), and the gifts at issue herein were made prior to January 1, 1977 (i.e., on December 30, 1976), under the plain language of the statute, the transfers are not includable in decedent's gross estate, regardless of decedent's intent at the time *629 of the transfers. In Estate of Gill v. Commissioner,79 T.C. 437 (1982), affd. 711 F.2d 54 (5th Cir. 1983), this Court thoroughly considered and rejected a similar argument on facts indistinguishable for the present purposes from those in the present case, stating: We do not believe that Congress intended by the amendment of section 2035(a) to leave a hiatus in coverage, exempting transfers made in contemplation of death prior to the passage of the Tax Reform Act of 1976 where the donor died after January 1, 1977. Nor do we believe Congress did so. For a section is amended only in accordance with the effective-date provisions prescribed by Congress. As noted, Congress specifically made the newly amended section 2035 inapplicable to transfers prior to January 1, 1977, leaving the old law intact as to these transfers. An amendment eliminates the amended material only to the extent specified by Congress, and what it has specified in this instance is clear. [2]
Accordingly, we conclude that the contemplation of death rules under former section 2035 are applicable to decedent's estate. *630 Issue 2 - Contemplation of Death
The second issue for resolution is whether the December 30, 1976, transfers of real property by decedent to Thomas and Sylvia were made in contemplation of death within the meaning of former section 2035(a). Former section 2035(b) created a rebuttable presumption that transfers occurring within 3 years of the decedent's death were made in contemplation thereof. Estate of Himmelstein v. Commissioner,73 T.C. 868, 871 (1980). The presumption is one of law, rather than fact, and it is not evidence in and of itself. Gillette's Estate v. Commissioner,182 F.2d 1010 (9th Cir. 1950). The party challenging respondent's determination has the burden of coming forward with evidence and proving that a gift was not made by decedent in contemplation of death. Estate of Lynch v. Commissioner,35 T.C. 142 (1960); Rule 142(a), Tax Court Rules of Practice and Procedure.
In United States v. Wells,283 U.S. 102 (1931), the Court stated: The words "in contemplation of death" mean that the thought of death is the impelling cause of the transfer, and while the belief in the imminence of *631 death may afford convincing evidence, the statute is not to be limited, and its purpose thwarted, by a rule of construction which in place of contemplation of death makes the final criterion to be an apprehension that death is "near at hand." [United States v. Wells, supra at 118.] The purpose of section 2035 is "to reach substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax." United States v. Wells,supra at 117. The fact that decedent may not have been in fear of imminent death is not controlling. The crucial question is whether, in light of all the facts and circumstances, the dominant motive in making the transfers was the thought of death or a purpose normally associated with life. United States v. Wells,supra;Estate of Gerard v. Commissioner,57 T.C. 749 (1972), affd. 513 F.2d 1232 (2d Cir. 1975). In Estate of Johnson v. Commissioner,10 T.C. 680 (1948), this Court stated that among the factors to be considered in determining the dominant motive of a decedent in making inter vivos transfers of property are: (a) The age *632 of the decedent at the time the transfers were made; (b) the decedent's health, as he knew it, at or before the time of the transfers; (c) the interval between the transfers and the decedent's death; (d) the amount of the property transferred in proportion to the amount of property retained; (e) the nature and disposition of the decedent, e.g., whether cheerful or gloomy, sanguine or morbid, optimistic or pessimistic; (f) the existence of a general testamentary scheme of which the transfers were a part; (g) the relationship of the donee or donees to the decedent, i.e., whether they were the natural objects of his bounty; (h) the existence of a long established giftmaking policy on the part of decedent; (i) the existence of a desire on the part of the decedent to escape the burden of managing property by transferring the property to others; (j) the existence of a desire on the part of the decedent to vicariously enjoy the enjoyment by the donees of the property transferred; and (k) the existence of the desire by the decedent of avoiding estate taxes by means of making inter vivos transfers of property. [Estate of Johnson v. Commissioner,supra at 688.] *633 Petitioners assert that motives associated with life were the reasons for the transfers in question. Respondent, on the other hand, argues that decedent's dominant motive was related to the thought of death. As is usually the case in litigated matters, each party cites a number of factors as supportive of his position. No single factor is dispositive of the issue. [2]
Decedent was 69 years old at the time the subject transfers were made. He was mentally alert, capable of taking care of his own personal needs, and still assisted in the operation of Premier on a part-time basis. Decedent's physical appearance did not indicate that his health was impaired, and he did not complain to his children of any illness or other problems with his health. He had, however, made complaints to his physician the prior month. He was aware that he suffered from heart disease, that his father died of heart disease, and the he had been recently referred by his regular doctor to an internist who had a particular interest in cardiology. Decedent was depressed about the death of Aletha, and the internist prescribed *634 an antidepressant for him. Prior to 1976, decedent gave the real property on which Premier is located to his seven children as tenants in common. In addition, he made individual gifts of real property to three of his children for the purpose of providing property on which each of them could build a house. Neither Thomas nor Sylvia had previously received an individual gift of real property. An established practice of generosity may be indicative of lifetime objectives. See Estate of Hill v. Commissioner,64 T.C. 867, 878 (1975), affd. 568 F.2d 1365 (5th Cir. 1978). The gifts in question here, however, followed identically the testamentary scheme set forth in decedent's will and were to two of his children, the natural objects of his bounty. Unlike their siblings, both Thomas and Sylvia resided outside the State of Indiana, and the property given to them consisted of farmland that was not intended as a site of homes to be constructed by them. These facts support respondent's determination that the gifts were part of the testamentary pattern and not in the pattern of lifetime transfers by decedent. The farmland was rented both before and after *635 the date of the gifts. Thus, it does not appear that decedent was trying to avoid any substantial burden of management. It appears that decedent was motivated, in part, by the desire to avoid the changes in the gift tax laws effected by the Tax Reform Act of 1976. Shortly before making the gifts, decedent was informed by his attorney that, from a tax point of view, any contemplated gifts should be made prior to 1977. This objective to save gift taxes may be indicative of a concern for lifetime consequences. Estate of Kneeland v. Commissioner,34 B.T.A. 816, 821 (1936). [3] The evidence, however, expressly shows that decedent was concerned with minimizing gift and estate taxes. After Aletha's death and prior to the time that decedent's attorney advised him regarding the 1976 changes in the law, decedent wrote to his attorney requesting a "schedule for disposing of my real property to the children to whom each parcel is willed so as to incur the least tax." This letter suggests that decedent's predominant motive in making the gifts was to minimize all transfer taxes by adopting a substitute for testamentary dispositions, a motive that strongly supports the *636 statutory presumption and respondent's determination. See Estate of Honickman v. Commissioner,58 T.C. 132, 135 (1972), affd. 481 F.2d 1399 (3d Cir. 1973). Petitioners argue that the fact that decedent remarried and subsequently led an active social life in 1977 and 1978 indicates that decedent's motives in making the gifts were not related to the thought of death. We are concerned here, however, with decedent's state of mind as of the date of the transfers.Events subsequent to that date are relevant only to the extent that they shed light on his state of mind at that time.Although his attitude was positive and admirable, it may have been attributable to the blossoming of his friendship with Lillian 6 months after the date of the gifts and not to influences present at the date of the gifts. We do not, therefore, give the evidence of his outlook during the succeeding year much weight. The facts in this case indicate that decedent had several motives associated with lifetime objectives. We are convinced, however, based on the entire record herein, that decedent's *637 predominant motive for making the transfers was the thought of death. Accordingly, we hold that respondent's determination must be sustained. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicted, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect at the date of death.↩
2. In this connection, we note the following explanation of the effective date provisions: "In general, the amendments apply to the estates of decedents dying after December 31, 1976, and to gifts made after December 31, 1976. However, the amendments relating to the estate tax treatment of transfers made within three years of a decedent's death do not apply to transfers made before January 1, 1977. The contemplation of death rules under prior law will apply to gifts made before January 1, 1977, where the decedent dies after December 31, 1976, and the transfer is made within 3 years of death. [General Explanation of the Tax Reform Act of 1976, Joint Comm. on Taxation, 94th Cong., 2d Sess. (1976), 1976-3 C.B. (Vol. 2), 1, 542. Emphasis supplied.]" [Estate of Gill v. Commissioner, supra↩ at 440.]
2. See Estate of Apple v. Commissioner,T.C. Memo. 1983-422↩.
3. See also Estate of Talbot v. Commissioner,T.C. Memo. 1981-560↩.