**SEQUA CORPORATION & AFFILIATES, Plaintiffs,**

v.

**UNITED STATES of America and the Internal Revenue Service, Defendants.**

**No. 03 Civ.4167 GEL.**

United States District Court, S.D. New York.

Sept. 27, 2004.

Bryan C. Skarlatos, Kostelanetz & Fink, LLP, New York City, for plaintiffs Sequa Corporation and Affiliates.

David N. Kelley, United States Attorney for the Southern District of New York (Michael C. James, of Counsel), New York City, for defendants the United States of America and the Internal Revenue Service.

## OPINION AND ORDER

LYNCH, District Judge.

Plaintiffs Sequa Corporation and its affiliates (collectively "Sequa") bring this action seeking a tax refund from the Internal Revenue Service, which Sequa claims it is owed under a proper interpretation of the Internal Revenue Code sections governing the corporate Alternative Minimum Tax. The Government argues for a different interpretation of those Code sections, and asserts that this interpretation supports the IRS's denial of Sequa's claimed refund. The parties have stipulated to all relevant facts, and agree that the dispute is a pure issue of law that is ripe for summary judgment. Sequa has so moved, and, for the reasons that follow, its motion will be denied.

## BACKGROUND [1]

The corporate Alternative Minimum Tax ("AMT") was created by Congress in the Tax Reform Act of 1986, which became effective as of January 1, 1987.[2] Pub.L. No. 99–514, 100 Stat.2085, 2320–45 (1986). The corporate AMT is codified in sections 55 through 59 of the Internal Revenue Code, and, like the AMT for individual taxpayers, is intended to ensure that corporate taxpayers who are eligible for many income tax exclusions, adjustments, credits, and deductions nonetheless pay at least a minimum amount of tax each year. The AMT is sometimes described as "parallel" to the regular tax system in that it has its own set of rules for calculating income and deductions and its own tax rates, which are different in certain respects from the rules and rates that make up the regular tax system. A taxpayer typically must calculate taxable income and tax due under both the regular tax system and the AMT, and then, in effect, pay the greater of the two calculated tax liabilities.

If a taxpayer's allowable deductions and exclusions exceed its gross income in a given tax year, the resulting difference is deemed a Net Operating Loss ("NOL"). Both the AMT and the regular tax system have rules for calculating NOLs, and both systems allow taxpayers to carry NOLs back or forward to offset net income in other tax years. During the years at issue here, both systems required NOLs to be carried back three years and then forward up to fifteen years; certain "specified liability" losses could be carried back ten years.

Sequa is a corporation that is the common parent of an affiliated group of corporations that file consolidated tax returns on a calendar year basis. During an audit of Sequa's 1986 through 1995 tax years, the Internal Revenue Service ("IRS") determined that (i) in 1987, Sequa had an Alternative Minimum Tax Net Operating Loss ("AMT NOL") of <$1,787,197>; (ii) in 1994, Sequa had a "specified liability" AMT NOL of <$14,186,681>; and (iii) in 1995, Sequa had a "specified liability" AMT NOL of <$19,497,373>.

In the course of the audit, the IRS carried each of these AMT NOLs back to 1986, and offset the full amount of each against Sequa's regular taxable income for 1986.[3] Sequa, in contrast, argued that

---

1. The parties have agreed on the relevant facts; this section is drawn from the Joint Stipulation of Facts submitted with plaintiffs' motion, and from the undisputed background information and legislative history in both parties' memoranda of law.

2. An Alternative Minimum Tax system for individual taxpayers has existed since 1979.

3. Since there was no AMT in 1986, this offset did not result in any recalculation of Sequa's taxes. This does not mean, of course, that Sequa received no tax benefit from these loss-

AMT NOLs could not be deducted in 1986, because Sequa had no AMT income in that year (as the corporate AMT did not yet exist). Sequa requested that each of these AMT NOLs be carried to 1988 and offset against Sequa's 1988 AMT income, producing a refund of $6,006,723 for that year and liberating an AMT tax credit that could be carried forward to Sequa's 1989 AMT income, producing a further refund of $1,087,527. The IRS denied these requests during the audit. Sequa then filed a formal Form 1120 request for the two refunds, which was also denied. Finally, Sequa filed this action, seeking the requested refunds for 1988 and 1989. The sole dispute between the parties is whether the Internal Revenue Code provides for AMT NOLs to be offset against regular taxable income in pre–1987 years, as the Government claims, or whether AMT NOLs may be offset *only* against AMT income, which by definition cannot exist before the 1987 tax year, as Sequa claims.

## DISCUSSION

### I. *Legal Standard and Burden of Proof*

■ Summary judgment must be granted where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The parties agree that there are no material factual disputes and that the matter is ripe for summary judgment. The parties disagree, however, on where the burden of proof lies. The Government maintains that a taxpayer seeking a refund has the burden of proving its entitlement to the refund. (D.Mem.4.) Sequa, on the other hand, contends that a taxpayer bears the burden of

proof solely on factual issues, and that, where the dispute is solely legal, neither party bears the burden of proof. (P. Rep. 2.) Sequa is correct in that the concept of "burden of proof" has no relevance where a dispute is solely on a question of law. It is well-established that the findings of the Commissioner in tax matters are presumed correct, and the taxpayer challenging those findings typically bears the burden of proof. *See, e.g., United States v. Janis,* 428 U.S. 433, 440, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976). However, where, as here, the taxpayer and the Commissioner have stipulated to the relevant facts, no burden of proof is applicable, as statutory interpretation is purely a legal question for the Court. *See, e.g., Kraft, Inc. v. United States,* 30 Fed. Cl. 739, 757 (Fed.Cl.1994) ("How fair market value is defined is a legal question [on which there is no burden of proof]; what constitutes fair market value in a particular case is a factual matter and the burden of proof is on the taxpayer.").

### II. *Statutory Interpretation*

This dispute centers on the interplay between two sections of the Internal Revenue Code: section 172(b)(2), "Amount of carrybacks and carryovers," and section 56(d), "Alternative tax net operating loss deduction defined." [4] Section 172(b)(2) reads, in relevant part,

> (2) . . . the entire amount of the net operating loss for any . . . loss year shall be carried to the earliest of the taxable years to which . . . such loss may be carried. The portion of such loss which shall be carried to each of the other taxable years shall be the excess, if any, of the amount of such loss over the sum

---

es. They presumably were taken into account as ordinary NOLs in calculating Sequa's regular income tax liability.

4. The parties agree that there is no relevant caselaw (and the Court's own research has revealed none) that might assist the Court in determining the meaning of the statutory text.

of the taxable income for each of the prior taxable years to which such loss may be carried.

As passed by Congress in 1986 and in effect throughout the tax years relevant here, section 56(d) reads, in relevant part,

(1) ... the term "alternative tax net operating loss deduction" means the net operating loss deduction allowable for the taxable year under section 172, except that—

> (A) the amount of such deduction shall not exceed 90 percent of alternative minimum taxable income determined without regard to such deduction, and

> (B) in determining the amount of such deduction—

>> (i) the net operating loss (within the meaning of section 172(c)) for any loss year shall be adjusted as provided in paragraph (2), and

>> (ii) in the case of taxable years beginning after December 31, 1986, section 172(b)(2) shall be applied by substituting "90 percent of alternative minimum taxable income determined without regard to the alternative tax net operating loss deduction" for "taxable income" each place it appears.

Section 56(d)(1)(B)(ii) was amended in 1996 as a collateral part of the "Small Business Job Protection Act of 1996," replacing the original language with the following: "appropriate adjustments in the application of section 172(b)(2) shall be made to take into account the limitation of subparagraph (A)." Pub.L. No. 104–188, § 1702(e)(1)(A)

(1996). The only legislative history on this amendment describes this change, among others, as merely "technical, clerical, and conforming amendments" to various prior revenue bills. *See* H.R. Conf. Rep. No. 104–737, at 348 (August 1, 1996). Unfortunately, in a case that turns in large part on divining the meaning of statutory language and the intent of Congress, both parties ignore the original language of section 56(d)(1)(B)(ii) and instead describe and analyze the statute as if the present amended version of that section had always existed. Although neither the original nor the amended version of section 56(d)(1)(B)(ii) unambiguously resolves the dispute here, the original language does provide clues to the correct interpretation of 56(d)(1) as a whole, and negates a number of Sequa's statutory interpretation arguments that are based, in part, on the amended language.[5]

Sequa argues that the "plain language" of these statutory sections requires that AMT NOLs be offset *only* against 90% of AMT income (and never against regular taxable income), and, since by definition Sequa had no AMT income in any year prior to 1987, Sequa's 1987, 1994 and 1995 AMT NOLs cannot be absorbed by its 1986 income and are thus fully available for use in post–1987 years. Sequa bases this view on its reading of the language of section 56(d)(1)(A)(i) and on three additional assertions: (i) that the AMT system is wholly "separate" from the regular tax system and calculations from each system can never cross over into each other (P. Mem.6–7, 16); (ii) that the existence of other explicit "transitional" rules for other AMT calculations indicates that Congress did not intend any differential treatment of

---

**5.** Section 56(d)(1)(A)(i) was also amended, in ways not relevant here, in 2002. Pub.L. No. 107–147, § 102(c)(1). Again, Sequa repeatedly quotes the present version of the statute, although it is not applicable to the tax years relevant here and provides no assistance in determining the intent of Congress in enacting the original language.

NOLs during the transition years, under the rule of *inclusio unius est exclusio alterius* (P. Mem.14–16); and, (iii) that the position on this issue contained in the General Explanation of the Tax Reform Act of 1986 (the "Blue Book") is incorrect and can be disregarded because the Blue Book is not authoritative (P. Mem.17–25).

The first two of these additional arguments can be summarily rejected. Although Sequa cites a handful of documents that refer to the AMT as "separate" or "parallel" to the regular tax system, courts have emphatically rejected this description as determinative of whether certain features of the Internal Revenue Code are applicable to AMT calculations (including in one case cited repeatedly by Sequa for other propositions). *See, e.g., Ventas v. United States*, 381 F.3d 1156, 1161–63 (Fed.Cir.2004); *Allen v. Commissioner*, 118 T.C. 1, 10–16, 2002 WL 14007 (U.S.Tax Court 2002). The Court agrees with those courts that, given the various conflicting provisions of the Internal Revenue Code and the legislative history of the AMT, the characterization of the AMT as wholly "separate" or "parallel" is unhelpful in resolving specific disputes—the terms are mere semantics and have no value as interpretative tools. Indeed, Sequa's own brief belies the "separateness" it claims, because, in making its *inclusio unius* argument (point (iii) above), Sequa relies on a Code provision that allows an allegedly forbidden "crossover" between the AMT and the regular tax system. (P. Mem.14–15.)

Sequa's *inclusio unius* argument—that Congress' inclusion of other transition rules precludes reading the disputed provisions in the Internal Revenue Service's favor here—is also flawed. As noted above, the original statutory language of section 56(d)(1)(B)(ii), ignored by plaintiffs, *did* include at least a partial transition rule

for AMT NOL carrybacks. Thus, whatever limited value such statutory construction rules may have, *see, e.g.,* Black's Law Dictionary 602 (7th ed.1999) ("several Latin maxims masquerade as rules of interpretation while doing nothing more than describing results reached by other means"), it offers no help to Sequa here.

Sequa's third point, though partially correct, likewise does not bolster the asserted correctness of its interpretation. It is true that the Blue Book is simply an interpretive manual created after the legislation is passed, is not legislative history, and cannot be taken as an authoritative guide to congressional intent. *See, e.g., Hutchinson v. Commissioner*, 765 F.2d 665, 669 (7th Cir.1985). But, of course, this fact does not *advance* Sequa's interpretation of the statute. It merely reduces the force of one consideration favoring the Government's position. As discussed further below, the Blue Book is persuasive authority, as an interpretation of the statute by a body of experts intimately familiar with the technicalities of a complex tax bill. Since none of these three propositions ultimately supports Sequa's argument, its position must rest on the asserted "plain meaning" of the statutory sections.

In opposition to these claims, the Government contends that, while the statutory language may not be a model of clarity, the position taken by the IRS in this case is preferable because it (i) is not contrary to the statutory language, (ii) is consistent with the Internal Revenue Code's longstanding NOL carryback rules, (iii) is implicit in the broad policy goals of the corporate AMT as expressed in the legislative history, and (iv) is supported by the Blue Book, which is persuasive authority. (D.Mem.14–20.)

■ We begin where all such debates must begin, with the language of the statute. *United States v. Gayle*, 342 F.3d 89,

92 (2d Cir.2003) ("Statutory construction begins with the plain text and, if that text is unambiguous, it usually ends there as well."). Here, while the text of each provision may be relatively straightforward, the application of the statutory text to the present situation is far from unambiguous. Contrary to Sequa's argument, the original text of section 56(d)(1)(B)(ii) seems to contemplate that AMT NOLs would be offset against regular income if they were carried back to pre–1987 years. Section 56(d)(1) begins by defining an AMT NOL as "the net operating loss deduction allowable for the taxable year under section 172," with certain exceptions. Among the exceptions is the specification that "in the case of taxable years [that is, years when the NOL deduction is used] *beginning after December 31, 1986,* section 172(b)(2) [which describes the procedure for carryback and carryover of NOL deductions] shall be applied by substituting '90 percent of alternative minimum taxable income determined without regard to the alternative tax net operating loss deduction' for 'taxable income' each place it appears." (emphasis added). The provision makes eminent sense, since AMT income did not exist prior to 1987. The logical consequence of this section, however, is that, for taxable years *prior to* December 31, 1986, AMT NOL carrybacks were simply to receive the treatment described in the unmodified section 172(b)(2)—offset against "taxable income," with any excess NOL carried forward to the next eligible taxable year until it is exhausted or there are no more eligible taxable years. The "plain meaning" of this subsection, taken alone, appears to lend strong support to the IRS's treatment of Sequa's AMT NOLs. At a minimum, reference to the original governing language of section 56(d)(1) undercuts Sequa's plain language argument, which in any event is compromised by a heavy reliance on bracketed inserts and paraphrases that make it apparent that the language of even the current text is by no means as "plain" as Sequa might wish. (*See, e.g.,* P. Rep. 2–3.)

However, this reading leaves unclear the pre–1987 application of section 56(d)(1)(A), which reads "the amount of such [AMT NOL] deduction shall not exceed 90 percent of alternative minimum taxable income determined without regard to such deduction." One possible reading suggests that this provision simply has no applicability to taxable years prior to 1987, because, by definition, there could be no AMT income in those years. This is consistent with the IRS's position. Sequa, on the other hand, asserts that the "plain meaning" of this subsection is that, in any year prior to 1987, the AMT NOL deduction should be zero (that is, 90 percent of zero), thus freeing up the entirety of any AMT NOL to be used in post–1986 years. While this reading may be appealing for its simplicity, it does not survive closer scrutiny. Essentially, adopting Sequa's position requires equating a null set with a mathematical calculation of "zero," or, stated another way, accepting that because something is incapable of calculation, the outcome of the impossible calculation is arithmetic zero. Sequa's AMT income in 1986 was not "zero" in a mathematical sense (as required for calculating an offset against 90–percent–of–zero); the concept of AMT income simply did not exist, because the statutory means of calculating that number were not yet in effect. Furthermore, Sequa's reading of 56(d)(1)(A) would render meaningless, for some period following the adoption of the AMT, section 56(d)'s reliance on section 172 (which requires that both types of NOL be first carried back three years before being carried forward), thereby creating by implication a transition rule that Congress could have created explicitly, but did not. Final-

ly, this reading would also read "in the case of taxable years beginning after December 31, 1986" out of section 56(d)(1)(B)(ii) (which, conveniently, Sequa has already done in its briefing), because, if Sequa's reading of subsection (A) is correct, there would be no need to specify a different modification of section 172(b)(2) for years before and after December 31, 1986.

■ Where a statute is ambiguous or is susceptible to multiple meanings, it is appropriate to look to other indications of Congressional intent, such as the legislative history or other contemporaneous commentary. As Judge Learned Hand advised, statutes "should be construed, not as theorems of Euclid, but with some imagination of the purposes which lie behind them." *Lehigh Valley Coal Co. v. Yensavage,* 218 F. 547, 553 (2d Cir.1914). Both parties agree that Congress's overall intent in creating the corporate AMT was to insure that any corporate taxpayer that had income in a given year pay at least some minimal amount of tax for that year. *See, e.g.,* S.Rep. No. 99–313, at 518 (May 29, 1986) ("the minimum tax should serve one overriding objective: to ensure that no taxpayer with substantial economic income can avoid significant tax liability by using exclusions, deductions and credits.") Even Sequa acknowledges in its opening brief that Congress' purpose in creating the "90 percent of AMT income" limitation on AMT NOL deductions was to preserve the broad policy goal of the AMT and "insure[ ] that an AT NOL cannot completely eliminate a taxpayer's AMT liability for any given year." (P. Mem. 4 n. 4.) This guidance, of course, goes only so far—Congress's overall purpose of reducing loopholes does not mean that every ambiguous provision of the AMT must be read against the taxpayer. However, where the statutory language otherwise supports the reading, and where there is no specific legislative history either pro or con, Congress's broad purposes suggest that section 56(d)(1)(A) should be read as a way of retaining some AMT income for taxation in each year a deduction is used, rather than as a way of freeing up the maximum value of the deduction to be used in subsequent years. In the choice between the two possible readings of subsection (d)(1)(A), accepting Sequa's reading would mean accepting that Congress, in contrast to its clear policy intent in creating the AMT, and while making other transition rules explicit, should be deemed to have implicitly created a three year "grace period" (from 1987 to 1990) in which AMT income could be reduced by NOL deductions that would have otherwise been used up by pre–1987 income (assuming that the regular tax NOLs were so used). This construction is unappealing.

■ Finally, the Government's position is supported by the 1986 Blue Book, which is prepared by the staff of the Congressional Joint Committee on Taxation, in consultation with the staffs of the House Ways and Means Committee and the Senate Finance Committee. (Declaration of Michael C. James, Ex. C.) With respect to the exact factual situation presented here, the Blue Book counsels: "Where, in the case of a corporation, an [AMT] NOL arises in a taxable year beginning after December 31, 1986, and is carried to another taxable year, the [AMT] NOL must be reduced by the corporation's [regular] taxable income for any taxable year beginning before 1987 to which the NOL was carried back under the regular tax system, notwithstanding that the [AMT] was not applicable in those years." (James Decl., Ex. A at 34.) Sequa has expended an inordinate number of its allotted briefing pages on debunking the value of the Blue Book, no doubt because its position is

squarely contrary to that advanced by Sequa. (P. Mem. 18–25; P. Rep. 10.) As noted above, Sequa is correct that the Blue Book cannot override clear statutory language and that it does not constitute legislative history, in that it does not, and does not purport to, directly represent the views of the legislators who voted to enact the relevant statutory provisions in 1986.

However, as other federal courts around the country have noted, the Blue Book, as an interpretation of the statute by experts involved in the drafting process and very familiar with the problems being addressed, plainly has some value, particularly where the statute is ambiguous and the only available legislative history is limited to expressing broad policy goals. *See Estate of Wallace v. Commissioner,* 965 F.2d 1038, 1050 n. 15 (11th Cir.1992) (Blue Book is "a valuable aid to understanding"); *McDonald v. Commissioner,* 764 F.2d 322, 336 n. 25 (5th Cir.1985) (Blue Book is "entitled to great respect"); *Hutchinson,* 765 F.2d at 669 (although not legislative history, Blue Book can be "highly indica-tive" of Congressional intent); *Ravenswood Group v. Fairmont Assocs.,* 736 F.Supp. 1285, 1287 (S.D.N.Y.1990) (citing to Blue Book explanation). Where, as here, the explanation offered by the Blue Book accords both with the explicit statements of broad Congressional intent and with the most logical and consistent reading of somewhat ambiguous statutory provisions, that explanation is entitled to some weight. That weight simply tips the scales further in the direction of the Government's position.[6]

Taking all of the indicators together—the statutory language, the interaction of the various provisions, the purpose of Congress, and the teaching of the Blue Book—and giving each its proper weight, the Court cannot conclude that the IRS erred in carrying Sequa's AMT NOLs back to 1986 and offsetting them against Sequa's regular taxable income. Accordingly, Sequa is not entitled to the refunds it seeks.

## CONCLUSION

For the reasons stated above, Sequa's motion for summary judgment is denied.

---

6. Sequa argues on reply that the Blue Book is no more than a treatise, equivalent to any other academic commentary. (P. Rep. 10.) As part of its efforts to discredit the Blue Book's interpretation and advance its own, Sequa cites three academic commentaries that it claims support its view of the statutory language. (P. Mem. 22–24, citing Daniel J. Lathrope, *The Alternative Minimum Tax* ¶ 6.11[3][f] (1994); Robert M. Brown, "Corporate Alternative Minimum Tax" § 28.04[4], 50 N.Y.U. Institute on Fed. Tax'n (1992); Robert M. Brown and Donald J. Massoglia, "Corporate Alternative Minimum Tax" § 7.07, 45 N.Y.U. Institute on Fed. Tax'n (1987).) First, two of the three are authored by the same person, so it is misleading to suggest that "three [separate] analyses ... amply negate[ ]" the Blue Book. (P. Rep. 10.) Second, Sequa selectively quotes from Professor Lathrope's treatise to make his analysis appear more favorable. (P. Mem. 23.) Lathrope does note that the Blue Book's approach "has been criticized," and offers some additional bases for questioning the position. However, Lathrope follows the quoted section with the following: "On the other hand, the transition rules do permit a corporation's pre–1987 net operating losses to carry over, with modifications, to post–1987 taxable years as AT NOLS. Perhaps offset of AT NOL carrybacks can be justified as a balanced approach." He then footnotes to the academic and practitioner commentary both for and against the Blue Book's interpretaion. *See* Lathrope, 6–94 n. 431 (citing Brown, *supra,* and Brown & Massoglia, *supra,* as critical of the Blue Book; and Hriszko, Schott & Stevens, "Reduction of Corporate AMT NOL Due to Regular Tax NOL Carrybacks," 19 Tax Adviser 778, 779 (1988), as in accord with the Blue Book.) The only reasonable conclusion to be drawn from the academic writing on this issue is that all observers agree that the statute is ambiguous. Beyond this unremarkable observation, the treatises offer little additional insight.

As this Order disposes of the sole issue in the case, and Sequa has failed to establish that it is entitled to the relief it seeks, the Complaint is hereby dismissed and the Clerk of the Court is respectfully directed to mark the case closed.

SO ORDERED.